MORGAN BROS. ET AL. *v.* DAYTON COAL & IRON CO., LIMITED, *et al.*

(*Knoxville.* September Term, 1915.)

1. **BANKRUPTCY.** Conflicting jurisdiction. State and federal courts.

The commencement of a bankruptcy proceeding against a corporation, in which there has been no adjudication of bankruptcy and no receiver appointed, is insufficient to deprive the State court of jurisdiction of a general creditors' bill against the corporation. (*Post, pp.* 236-238.)

Cases cited and approved: Hobbs v. Head & Dowst Co., 184 Fed., 414; Virginia Iron, Coal & Coke Co. v. Olcott, 197 Fed., 734; Benwood Brewing Co. (D. C.), 202 Fed., 326.

Case cited and distinguished: New River Loan & Land Co. v. Ruffner Bros., 165 Fed., 881.

2. **APPEAL AND ERROR.** Conflicting jurisdiction. Presentation of question.

The objection to jurisdiction of the State courts of a general creditors' bill because of commencement of bankruptcy proceedings against the defendant should be presented in the trial court, and, if overruled, an appeal taken from the decision. (*Post, p.* 238.)

3. **CORPORATIONS.** Creditors' suit. Pleading. Bill.

Where the complainants in a creditors' bill attack the validity of a mortgage and bonds given by defendant corporation, the bill should set out facts relied upon to establish fraud in the transaction, and mere general statements will not suffice. (*Post, pp.* 239, 240.)

Case cited and approved: Merriman v. Lacefield, 51 Tenn., 217.

Case cited and distinguished: Kelley Bros. v. Fletcher, 94 Tenn., 7.

Morgan Bros. v. Coal & Iron Co.

4. FRAUDULENT CONVEYANCES.  Pleading.  Issues and proof.

Where a general creditors' bill undertakes, in connection with general statements of fraud, to state in detail why the transaction is attacked, and upon what grounds it is claimed to be fraudulent, the proof will be limited to such allegation. (*Post, pp.* 239, 240.)

5. CORPORATIONS.  Foreign corporations.  Validity of contracts. Filing charter.

That a foreign corporation was not authorized to do business in the State, not having filed its charter with the secretary of State as required by statute, does not render a mortgage and debentures of the corporation void.  (*Post, pp.* 240-242.)

Case cited and approved:  Louisville Property Co. v. Mayor & City Council of Nashville, 114 Tenn., 218.

6. CORPORATIONS.  Creditors' suit.  Pleading.  Issues and proof.

Where a creditors' bill against a mining corporation alleged that bonds, which purported to be for the purpose of taking up outstanding indebtedness, were in fact issued to protect the company in the event of any calamity, such as an explosion in the mines, proof that the holders of the corporate stock undertook, by various reorganizations, to exchange their stock holdings for bonds of the defendant company forms no basis of a decree for complainants.  (*Post, pp.* 242, 243.)

7. CORPORATIONS.  Contracts.  Validity.  Evidence.

Where the parties by their pleadings and stipulations have made a case where a corporation has purchased property necessary and proper for corporate use and issued therefor its capital stock and bonds, a *prima facie* case of valid payment for the stock and bonds is established.  (*Post, pp.* 243-245.)

Case cited and distinguished:  Kelley Bros. v. Fletcher, 94 Tenn., 7.

8. CORPORATIONS.  Bonds.  Rights of holders.

Bonds of a corporation, payable to a certain bank or other registered holder for the time being, and providing in case of a registered transfer that the principal and interest will be paid

without regard to any equity between the company and the original or any intermediate holder, whether technically negotiable or not, are free from equitable defenses in the hands of an innocent holder.  (*Post, pp.* 245-254.)

Cases cited and approved:   Strauss v. United Telegram Co., 164 Mass., 130; Raymond v. Middleton, 29 Pa., 530.

Cases cited and distinguished:   Cronin v. Patrick County (C. C.), 89 Fed., 79; De Voss v. City of Richmond, 18 Grat. (59 Va.), 338; In re Goy & Co., 2 L. R. Ch. Div., 149; In re Taylor's Agreement Trusts, 2 L. R. Ch. Div., 737; In Re Gas Co., 20 L. T., 40; In-Re Tea Co., 10 L. R. Equity Cases, 157.

9. **CORPORATIONS.  Fraudulent conveyances.  Persons .entitled to assert invalidity.  Subsequent creditors.**

The bonds and mortgage of a corporation may be attacked on the ground that they are invalid as conveying consumable property or reserving other benefits to the mortgagor, who is permitted to continue in possession, by subsequent creditors. (*Post, pp.* 254-262.)

Cases cited and aproved:   Martin v. Oliver, 28 Tenn., 565; Gilbert v. Peppers, 65 W. Va., 355; McKeldin v. Gouldy, 91 Tenn., 677.

Cases cited and distinguished:   Tennessee Nat. Bank v. Ebbert, 56 Tenn., 165; Scott v. Keane, 87 Md., 723; Bank v. Watkins, 126 Tenn., 453.

10. **CORPORATIONS.  Bonds.  Mortgages.  Construction..**

The court will not, unless constrained to do so by the terms of the instrument in the light of the surrounding circumstances, give to corporate bonds and mortgage such an interpretation as would make them void.  (*Post, pp.* 262, 263.)

Case cited and distinguished:.  Gernt v. Floyd, 131 Tenn., 122.

11. **CORPORATIONS.  Fraudulent conveyance.  Persons entitled to assert invalidity.  Subsequent creditors.**

Where the property described on the face of a corporate mortgage is not of such nature as to make it fraudulent and void, it can-

Morgan Bros. v. Coal & Iron Co.

not be attacked by subsequent creditors on the ground that the general conveying clause includes property not proper to be mortgaged, the possession and use of which is reserved to the mortgagor. (*Post, pp.* 263, 264.)

12. **CORPORATIONS. Mortgage. Construction. Ejusdem Generis. "All property and estate."**

In a mortgage, describing the property conveyed as mineral lands, furnaces, equipment, etc., and "all property and estate wherever situate," the quoted phrase refers to all property of a similar nature which may have been overlooked in the detailed description, and does not include cash on hand, commissary stock, iron ore, pig iron, etc., nor accounts receivable. (*Post, pp.* 264-267.)

Cases cited and approved: Lynchburg v. N. & W. R. R. Co., 80 Va., 249; Benton v. Benton, 63 N. H., 289.

Case cited and distinguished: Williams v. Williams, 18 Tenn., 26.

13. **CHATTEL MORTGAGES. Transactions invalid. Retention of possession by mortgagor. Consumable property.**

A mortgage upon property necessarily consumable in its use, where possession and use is reserved in the grantor, is fraudulent upon its face and void. (*Post, pp.* 267-281.)

Cases cited and approved: Bank v. Brier, 95 Tenn., 331; Austin v. Bell, 20 Johns. (N. Y.), 446; Mackie v. Cairns, 5 Cow. (N. Y.), 566; Ross v. Young, 37 Tenn., 629; Bodley v. Goodrich, 7 How., 276-278; Bank of Rome v. Haselton, 83 Tenn., 237; Lowenstein Bros. v. Love, 84 Tenn., 660; Wade et al. v. Green, 22 Tenn., 549; Alabama Nat. Bank v. Coal & Ry. Co., 108 Ala., 288; Johnston & Stewart v. Riddle, 70 Ala., 219; Am. Bridge Co. v. Heidelbach, 94 U. S. 798; Fosdick v. Schall, 99 U. S. 235; U. S. Trust Co. v. Railroad, 150 U. S., 307.

Cases cited and distinguished: Darwin v. Handley, 11 Tenn., 502; Somerville v. Horton, 12 Tenn., 549; Masson v. Anderson, 62 Tenn., 290; Doyle v. Smith, 41 Tenn., 15; Tenn. Nat. Bank v. Elbert & Co., 56 Tenn., 153; Bank v. Erwin, 2 Shan. Cas., 444; N. Y. Security & Trust Co. v. Saratoga Gas & Electric Light

Co., 159 N. Y., 137; Clay v. Railroad Co., 53 Tenn., 421; Knapp v. Milwaukee Trust Co., 216 U. S., 552.

14. **CHATTEL MORTGAGES.** Rights of Creditors. Retention of possession by mortgagor.

A mortgage on a stock of merchandise, with possession and right to continue business reserved to the mortgagor, is fraudulent upon its face and void. (*Post, pp.* 267-281.)

15. **CHATTEL MORTGAGES.** Rights of creditors. Retention of possession by mortgagor.

A mortgage on personalty not necessarily consumable in its use, where possession and right to use the property is reserved in the grantor, will not be *held* invalid, unless it appears from the instrument as a whole that the reservation is inconsistent with the purposes of the instrument and is for the general benefit and advantage of the grantor. (*Post, pp.* 267-281.·)

16. **CORPORATIONS.** Mortgage. Construction and operation. Rents and profits. ·

Under a mortgage by a going concern of its real estate, plant, and establishment, together with its income, issues, and profits, choses in action, etc., reserving a right of user and enjoyment in the grantor until default, and giving the mortgagee the right to enter and take charge of the plant and operate it to discharge the mortgage debt, the income, issues, profit, etc., do not pass under the lien of the mortgage until default and possession thereunder by the trustee, and the lien then only attaches to such income, issues, etc., as arise after defauult and possession thus taken. (*Post, pp.* 267-281.)

17. **CORPORATIONS.** Fraudulent conveyance. Transactions invalid. Retention of possession by mortgagor.

A mortgage by a corporation of its real estate, plant, equipment, stock, bonds, leases, together with the issues and profits, reserving in the mortgagor the right of possession until default and possession taken by the mortgagee, does not indicate that the reservations are made for the benefit of the mortgagor and to cover up the property from other creditors, and it not invalid as to such creditors. (*Post, pp.·* 281, 282.)

Morgan Bros. v. Coal & Iron Co.

18. **CORPORATIONS. Foreign corporations. Insolvency.**

Acts 1877, ch. 31, sec. 5, providing that, on insolvency of a foreign corporation carrying on business in the State, resident creditors have a priority over simple contract creditors of any other country, is valid to the extent that corporations of another State will be deferred thereunder to resident creditors. (*Post, pp.* 282, 283.)

Acts cited and construed: Acts 1877, ch. 31, sec. 5.

Cases cited· and approved: McClung v. Embreeville, etc., Co., 103 Tenn., 399; Blake v. McClung, 172 U. S., 239.

19. **TREATIES. Construction. Hay-Pauncefote treaty.**

The Hay-Pauncefote Treaty (31 Stat. 1939) art. 2, providing that the citizens or subjects of each of the contracting parties have full power to dispose of·their personal property within the territories of the other, by testament, donation, or otherwise, does not affect the validity or application of Acts 1877, ch. 31, sec. 5, giving resident creditors of an insolvent foreign corporation a preference over nonresidents. (*Post, pp.* 283, 284.)

---

FROM RHEA.

---

Appeal ·from the Chancery Court of Rhea County to the Court of Civil Appeals, and by' *certiorari* to the Court of Civil Appeals from the Supreme Court.—V. C. ALLEN, Chancellor.

GEO. H. WEST, WILLIAMS & LANCASTER and ALLISON, LYNCH & PHILLIPS, for plaintiffs.

W. B. MILLER, for defendant receiver.

JOHN K. SHIELDS, SIZER, CHAMBLISS & CHAMBLISS and JOLINE, LARKIN & RATHBONE, for defendants.

Mr. Special Justice Frantz delivered the opinion of the Court.

The original bill in this cause was filed in the chancery court of Rhea county, Tenn., June 15, 1913, being a general creditors' bill filed for the purpose of administering the assets of the Dayton Coal & Iron Company, Limited, a corporation under the laws of Great Britain. Several amended bills were filed, but the amended and supplemental bill of January 5, 1914, is the one brought into the record in this cause, and contains the detailed charges upon which the issues were made which are now before the court for decision.

Quite a number of questions are raised in the pleadings. We will briefly state those which are here for decision of this court.

The main question involved is the validity of a certain mortgage made to the Central Trust Company of New York, as trustee, on October 1, 1902, to secure bonds to the amount of 100,000 pounds sterling, and the validity of the debentures themselves is assailed upon grounds which will be set out more in detail at a later point in this opinion.

The chancellor decreed that the said mortgage was void because it covered property which was consumable in its use, and annulled and set aside said mortgage. With respect to the validity of the bonds the chancellor decreed that the record would not justify a decree declaring them invalid, but held that the holders of the bonds should produce and prove their claims be-

Morgan Bros. v. Coal & Iron Co.

fore the clerk and master on a referance as other cred-
itors. The court of civil appeals affirmed the holding
of the chancellor with respect to the mortgage, but held
with respect to the debentures that they were entitled
to participate as creditors in the assets of the corpora-
tion—"alone upon the basis of the actual consideration
they paid for the same, which consideration so paid
went into the treasury of the said Dayton Company;
Tennessee creditors, as aforesaid, being first paid."

Both complainants and defendants have brought the
cause to this court by proper petition for *certiorari;*
and it is likewise brought here by the Bank of Mon-
treal upon a question hereinafter to be discussed; and
errors have been assigned, which we will consider.

We are met with a preliminary question pertaining
to our jurisdiction to determine this cause, arising as
follows:

The James Supply & Hardware Company and oth-
er creditors have filed their petition in this cause,
the same being filed upon the day the case was
heard by this court at the present term (the same
having been heard at the last term and reassigned to
the docket for argument at the present term) which pe-
tition set up substantially that on the 21st day of June,
1913, a petition was filed by them in the district court
of the United States for the southern division of the
eastern district of Tennessee, seeking to have the de-
fendant Dayton Coal & Iron Company adjudged a bank-
rupt and its property administered by that court under

the Bankruptcy Act of 1898 (Act Cong. July 1, 1898, ch. 541, 30 Stat. 544). It is alleged in the petition that the grounds upon which the bankruptcy proceeding was based was substatially that the proceedings in this cause constituted an act of bankruptcy. It is further shown in the petition and the exhibits thereto that a denial of the facts essential to the adjudication was duly made, and that upon trial in the United States district court at Chattanooga a directed verdict was had in favor of the contention of the Dayton Coal & Iron Company, and upon appeal to the United States circuit court of appeals at Cincinnati this decision was reversed, that court holding that under the facts in the case complainants were entitled to go to the jury upon the question as to whether or not this corporation had committed an act of bankruptcy within the purview of the act. It was alleged in the petition that the case was remanded to the United States district court at Chattanooga, where it will stand for trial at the next term of that court. After the recitation of these facts, petitioners pray as follows:

"Wherefore petitioners present the facts for the information of the court and pray the court to grant a stay of proceedings in this case as required by law."

This petition was answered, and the defenses thereto were: First. That it comes too late; that it is not verified and is not accompanied by a full transcript of the record. Second. That the most that can be said is that the bankruptcy court might have authority, upon proper adjudication, to assume exclusive jurisdiction

of the property in question, but that it has not done so; that no adjudication in bankruptcy has been had by the federal court, and that the federal court has never appointed any receiver of the property, or made any order by which it has attempted to take or assert exclusive jurisdiction of the administration of this bankrupt's property. The latter position is, in our judgment, manifestly sound. We pretermit any discussion as to whether or not, the State court having acquired jurisdiction of this case prior to the filings of the petition in bankruptcy, it is entitled to proceed to final decree with respect to the issues. In the case of *New River Loan & Land Co.* v. *Ruffner Bros.*, 165 Fed., 881, 91 C. C. A., 559, the question was passed on by the United States court of appeals for the fourth district. The syllabus of that case is as follows:

"A district court as a court of bankruptcy has exclusive power to determine whether a suit pending in a State court should be stayed or not, and the exercise of this power rests in the discretion of the judge, which will not be reviewed by an appellate court unless it appears to have been abused."

This holding seems to have been specifically approved in *Hobbs* v. *Head & Dowst Co.*, 184 Fed., 414, 106 C. C. A., 519, and in *Virginia Iron, Coal & Coke Company* v. *Olcott,* 197 Fed., 734, 117 C. C. A., 124, and in *Benwood Brewing Company* (D. C.), 202 Fed., 326. In the case at bar it is not contended that the federal court has undertaken to take jurisdiction of the administration of the affairs of this corporation. There has been

no adjudication in bankruptcy, and, in fact, it appears from the answer of the receivers that that court has refused to appoint any receiver. If, as stated in the *Ruffner Case*, that court is vested with exclusive jurisdiction to determine whether or not it shall assume exclusive jurisdiction of the controversy, it clearly appears in this case that it has not done so, and indeed has·refused to assert or claim such jurisdiction, and under such circumstances it is not only the right, but the duty, of this court to proceed to a determination of the questions before it.

Furthermore, we think the question should have been made, if at all, by proper petition presented to the lower court, which, so far as this record shows, was not done, or, if done, that the action of the lower court was not seasonably invoked thereon, and appeal taken.

The assignment of error filed on behalf of the complainant goes to the action of the court in refusing to declare the debentures null and void by reason of the fact that they are not supported by any valid consideration.   We will consider this assignment along with assignments Nos. 7 and 8, filed on behalf of the Central Trust Company and the Scottish Banks.  These assignments are to the effect that the court of appeals erred in remanding the case to the chancery court for further proof as to the debt of the petitioner banks, and in limiting the participation of the petitioners to the consideration paid which ''went into the treasury of the said Dayton Company.''

In the consideration of this question we look first to the pleadings in this cause, for the purpose of determining what questions were raised upon which it was competent or necessary to introduce proof, and next to the proof introduced in support of them. With reference to the issues made by the pleadings, it has been said by this court in *Kelley Bros.* v. *Fletcher,* 94 Tenn., 7, 28 S. W. 1099:

"The controlling question raised by the assignments of errors and reply thereto is one of pleading and practice. For complainants it is contended that the burden was upon the defendants to show, by proof, independent of the fact of assignment by Lambie and acceptance by the corporation, that the property assigned by him to the corporation was reasonably worth the par value of his stock; while, on the other hand, the contention for the defendants is that it was incumbent upon the complainants first to allege, and then to prove, that the property so assigned was not reasonably worth so much.

"The contention of the defendants, both as to the matter of pleading and as to the burden of proof, is well sustained upon principle and upon authority. It is a fundamental maxim in chancery pleading and practice that the complainant must give the defendant notice of the case to be made against him, by alleging in the bill the facts intended to be proved, and that proof of facts not so alleged will be rejected because not responsive to the issue. Story on Equity Pleading, secs. 27, 28, 257; 1 Daniell's Chancery Pleading and

Practice, 327, 952; Beach on Modern Eq. Prac., secs. 89, 95, 99; *Merriman* v. *Lacefield*, 4 Heisk., 217; *Austin* v. *Ramsey*, 3 Tenn., ch. 121.

"It having been lawful for Lambie to sell, and for the corporation to buy, such property as he assigned in payment of his stock, and they having exchanged one for the other, we can see no good reason why their contract in that behalf should not be binding upon all parties concerned or affected thereby, so long as it remains unimpeached. Nothing appearing to the contrary, the law presumes the contract to have been made in good faith, and the property of Lambie to have been sold and bought at a fair valuation; and when the defendants established the fact of the contract and its terms, without more, they thereby made a *prima facie* case of valid payment by Lambie."

In other words, it is fundamental in cases of this character that the complainant shall set out facts upon which he relies to establish a fraud in the transaction. Mere general statements will not suffice, and especially when the complainant undertakes, after general statements of fraud or in connection with general statements of fraud, to state in detail why the transaction is attacked and upon what grounds he claims it to be fraudulent, his proof will be limited to such allegation.

Referring to the pleadings in the cause: After stating that the mortgage and debentures were null and void, the reasons therefor are given in some detail. It was claimed, first, that the Dayton Company No. 3, which executed the mortgage and debentures, was not

authorized to do business in Tennessee, not having filed its charter with the secretary of State in compliance with our statute. This allegation of fact is sustained by the record, but it is unsound in law, and we do not understand that it is now insisted upon. At any rate, the question is settled at least by analogy by the decision of this court in *Louisville Property Company v. Mayor and City Council of Nashville,* 114 Tenn., 213, 84 S. W., 810, in which it was held by this court that where a foreign corporation acquires property within the State of Tennessee without complying with the requirements of our statutes, such acquisition is valid as against every one save the State. So there is no merit in this contention.

The next contention is that the mortgage upon its face covers property consumable in its use, and for that reason is null and void. This contention will be considered at a later point in this opinion.

It is next alleged in the bill that the debentures in question purported, upon the face of the transaction, to be used in retiring and paying other outstanding and matured debentures of the Dayton Company, and that there was not in fact at the time any valid outstanding debentures of the Dayton Company, and that it was not the purpose of said Dayton Company to use the said new debentures to take up and retire any valid, outstanding, and matured debentures. Then, proceeding to a detailed statement of the fraudulent purposes for which said original debentures were issued and for

134 Tenn. 16

which the mortgage and debentures in question were issued the complainants allege that at the time the bonds were issued they were never sold or disposed of, but that they were issued because the company had suffered several calamities by way of explosions in its mines, and that upon the suggestion of an American friend of an officer of the Dayton Company that it was customary in this country for corporations to protect themselves in this manner, a bond issue was placed upon the property, and that it was placed on this property for that purpose and for no other purpose; that the bonds were not in fact disposed of, and never constituted an outstanding *bona fide* debt of said company. It is alleged that it never was the intention to take up and retire any other outstanding bonds or debentures of the company; but, on the contrary, that they were executed for the sole purpose of having them stand as a security or protection to the property of the company in the event any calamity of the kind already described (explosion in the mines) should occur in the future. It is alleged that none of the bonds were sold; that the company received no benefit from any disposition of them; that at no time did it pay any interest coupons upon the same; and that if for any fact they were outstanding, they were transferred long after they were due, and, in fact, only a few days before or a few days after the bill in this cause was filed.

Now, these are the allegations in the bill which undertake to describe the fraud complained of with particularity, and upon these allegations the issues were

made. It is not contended that there is any proof in this record to support any of them. The statement in the record that some traveling man told an employee that such was the intention of the bond issue, and this employee mentioned it to one of the managers of the company, and that he smiled is hardly enough to create even a suspicion in the minds of any one that these were the actual facts of the case. It is elemental that pleadings without proof, or proof without pleadings, will not form the basis of a judgment or decree of the court. The pleadings in this cause make out one case of fraud in so far as the validity of the debentures are concerned, and the argument now adduced upon the record proceeds upon an entirely different theory. We find no allegation in this bill to the effect that the holders of the stock in this corporation undertook, by various reorganizations of the corporation, to swap their stockholdings for bonds of this company—such is the argument now. It is not competent to attack the validity of a proceeding of this kind by the proof, even if the proof justified it, without some pleading upon which to base it. No such charge is contained in any of the bills, and, in fact, even if the question were properly made in the pleadings, it is not supported by the proof.

There had been three previous corporations with the same name previously organized under the laws of Great Britain, one in 1883, one in 1884, and a leasing company in 1895. The bills charge in substance, that all of these corporations had been liquidated under the

laws of Great Britain; that the property had, by conveyance, passed to Donaldson and McKinnon, who thereupon transferred it to the present company. The contract under which this transfer was made recited that Jas. Watson & Co. were the beneficial owners of the property. We are asked to infer that, although the companies had been liquidated under the laws of Great Britain, James Watson & Co. were the beneficial owners by reason of their stockholdings in the previous companies. It appears by the pleadings and stipulations of counsel in this cause that the property passed out of the hands of Donaldson and McKinnon to the present company in consideration of £80,000 of its bonds and a considerable block of its capital stock. There is no proof in this record that the property was not reasonably worth the amount thus paid for it by the corporation; and, as said by this court in *Kelley Bros.* v. *Fletcher,* supra:

"It having been lawful for Lambie to sell, and for the corporation to buy, such property as he assigned in payment of his stock, and they having exchanged one for the other, we can see no good reason why their contract in that behalf should not be binding upon all parties concerned or affected thereby, so long as it remains unimpeached. Nothing appearing to the contrary, the law presumes the contract to have been made in good faith, and the property of Lambie to have been sold and bought at a fair valuation; and, when the defendants established the fact of the contract and its

terms, without more, they thereby made a *prima facie* case of valid payment by Lambie."

So, in the case at bar, when the parties by their pleadings and their stipulations have made a case where by contract this corporation has purchased property necessary and proper for the corporate use and has issued therefor its capital stock and bonds, we hold that a *prima facie* case of valid payment for the stock and bonds has been established, and there is nothing in this record to impeach said transaction.

It follows from what has been said that the assignment of errors on the part of the complainants will be overruled and those on behalf of the banks will be sustained to the extent of holding that, since the bonds held by them are shown to have been issued upon a valid consideration, and since by stipulation of counsel it is shown in this cause that they have been acquired by the banks in the usual course of business and held by them as collateral to an indebtedness largely more than the bonds, said bonds are a valid and subsisting obligation of the Dayton Coal & Iron Company. But, because of the fact that what we have said with respect to the *bona fides* of this transaction under which the original debentures were issued applies only to the debentures issued to James W. Watson & Co. and by them transferred, or upon their order issued, to the petitioning banks, and because it appears that there are other holders of bonds issued under the mortgage for £100,000, and because it does not clearly appear in this record what the consideration was moving to

this corporation for the issuance of said additional
bonds, it becomes necessary for us to examine the next
question presented with respect thereto, to wit, the
negotiability or nonnegotiability of the bonds in ques-
tion.  It is contended on behalf of the complainants
that the bonds are not negotiable, and this is based up-
on the fact that the bonds are not upon their face made
payable to a certain payee to his order or bearer.  The
provisions in the bonds applicable are as follows:

"The Dayton Coal & Iron Company, Limited (here-
inafter called the Company), will on the 1st day of Oc-
tober, 1912, or on such earlier day as the principal
moneys hereby secured become payable in accordance
with the conditions indorsed hereon, pay to the Com-
mercial Bank of Scotland, Limited, or other, the reg-
istered holder for the time being hereof, the sum of
one hundred pounds."

In the conditions indorsed on the bonds, and which,
by express terms of the bonds, are made part thereof,
it is provided that the registry of the debentures will
be kept at the Company's registered office wherein
there will be entered the names, addresses and descrip-
tion of the registered holders of the bonds and the par-
ticulars of the debentures by them held, respectively,
and that this registry will be open at all reasonable
hours for the inspection of the legal holder of the bonds
or his representative.  It is further provided that the
registered holder will be regarded as exclusively enti-
tled to the benefit of the debenture, and that the Com-
pany shall not be bound to enter in register notice of

any trust or to recognize any right in any other person save as therein provided. It is further provided that every transfer of this debenture must be made in writing under the hand of the registered holder or his legal representative, and that the transfer must be delivered at the registered office of the Company, with a fee of two shillings and sixpence and such evidence of identity or title as the Company may reasonably require. It is further provided that no transfer will be registered during the seven days immediately preceding the days of this debenture fixed for payment of interest. It is further provided that the principal and interest evidenced by the debenture will be paid without regard to any equity between the Company and the original or any intermediate holder thereof, and that the receipt of the registered holder of such principal and interest shall be a good discharge to the Company of the same.

The question presented for the considerations of this court is: Is such a bond negotiable, or, if not negotiable, is the agreement contained within condition 7, above referred to, that the same will be paid without regard to the equities between the Company and the holder, a valid and binding agreement, and will it be available to the innocent holder in a contest between him and creditors of the corporation issuing the obligation?

Mr. Daniel, in his work on Negotiable Instruments, thus states the rule:

"It would seem from the few decisions that exist on the subject that registered bonds are not negotiable, and that they are in fact registered so as to make them transferable in such manner as to exclude equities between the original parties only by registry upon the books of the corporation issuing them."

He cites in support of his proposition *Cronin* v. *Patrick County* (C. C.), 89 Fed., 79, 4 Hughes, 529, and also *De Voss* v. *City of Richmond,* 18 Grat. (59 Va.), 338, 98 Am. Dec., 646.

In the case of *Cronin* v. *Patrick County* it was held by the court in broad terms that registered bonds are nonnegotiable. The court, however, used this significant language:

"When there are no negotiable words in a bond, and it is not made payable to order or to bearer, but is made payable to 'assigns,' the use of that word imports non-negotiability, and is one of the distinguishing features of a bond intended to be nonnegotiable."

It is also to be noted in the opinion that, while the bonds were upon their face to be registered, upon being transferred upon certain power of attorney the bonds had never been in fact so registered. The court in that case specifically approved *De Voss* v. *City of Richmond,* supra, saying:

"In the case of De Voss against the city of Richmond, the Virginia court of appeals, basing its decision on the principles that have been indicated, held that the holder of a registered bond before its transfer held it subject to all the equities which the obligor

might have against any prior holder, and that these equities were not cut off until the original bond was taken in, and another bond issued in lieu of it to the last holder. It held that the issuing of a second bond did cut off all the equities which had attached to the first, and carried a clear legal title to the assignee receiving it.''

The case of *De Voss* v. *City of Richmond* was one where, upon registration of the transfer of a bond, the old bond was taken up and a new one issued to the transferee, and although it was stated in the new bond issued that it was issued in lieu of the old bond, giving the number of it and somewhat of its history, it was held in that case that the new certificate having been issued cut off all defenses arising, or which might have been made, against the holder of the old certificate.

Mr. Machen in his work on Corporations, vol. 2, sec. 1743, states the rule thus:

''A registered bond or debenture is no less negotiable than a bearer bond. The difference is rather in the method of the negotiability. As a bill or note payable to order is negotiable, so is a registered bond or debenture. A transfer by registration is equivalent to a transfer by indorsement of a bill or note. After registration, the company is effectually precluded from raising any equitable defenses which would have been available against the transferor. Moreover, the registered transferee cannot, like an assignee of a nonnegotiable chose in action, sue in the name of the transferor, but can sue in his own name only.''

However, it is stated that a company may set up equities against a transferee who has not paid value. The author cites in support of the text *Strauss* v. *United Telegram Co.,* 164 Mass., 130, 41 N. E., 57. The bond in that case was one payable to bearer, or, if registered, to the registered holder. These bonds were held negotiable by the court.

Mr. Daniel in his work on Negotiable Instruments thus states another proposition relevant to this inquiry:

"No precise form of words is necessary to impart negotiability. As has been said in Pennsylvania, 'order' or 'bearer' are convenient and expressive, but clearly not the only words which will communicate the quality of negotiability. Some equivalent words should be used. Words in a bill, from which it can be inferred that the person making it, or any other party to it, intended it to be negotiable, will give it a transferable quality against that person. The concession, therefore, may be made that if the makers of this note, having omitted the usual words to express negotiability, had said 'This note is and shall be negotiable,' it would have been negotiable."

He cites in support of the text *Raymond* v. *Middleton,* 29 Pa., 530, which clearly supports the text. We are referred to a number of English authorities which, to a certain extent, are in point upon this inquiry.

In the Laws of England by the Earl of Halsbury, in discussing provisions of this character in bonds and mortgages, it is said:

"Where the security is not transferable at law, a company may, by the terms of issue of the security, or by its subsequent conduct, be estopped from denying the legality of the security as against a *bona fide* assignee for value without notice of any irregularity." Page 342.

Again, it is said by the same authority on page 358:

"When the principal and interest secured by the debentures are to be paid to the registered holder for the time being, without regard to any equities subsisting between the company and the original or any intermediate holder, and the conditions as to transfer are similar to those above mentioned, a liquidator is bound to register the transfer, although the same is made after the liquidation commenced," etc.

In Agra & Masterson's Bank, 4 English Ruling Cases, it is said:

"Generally speaking, a chose in action, assignable only in equity, must be assigned subject to the equities existing between the original parties to the contract, but this is a rule which must yield when it appears from the nature or terms of the contract that it must have been intended to be assignable free and unaffected by such equities."

In *Re Goy & Company, Limited,* 2 L. R. Ch. Div., 149, it is said:

"As a general rule, the transferee of a chose in action stands in no better position than his transferor. There is nothing, however, to prevent a debtor from contracting with his creditor that he will not avail him-

self against a transferee of any rights which he may possess against the creditor or any assignee of his.''

In *Re Taylor's Agreement Trusts*, (1904) 2 L. R. Ch. Div., 737, where the bonds were made payable to a certain person ''or other, the registered holder for the time being,'' it was said:

''The object of the conditions as here expressed is that if the transferee becomes the registered holder of the debentures, the company is precluded as from the date of registration from setting up as against the transferee any rights it may have possessed as against the original holder, but that does not mean that the transferor or the transferee is given a right to insist on the registration of the transfer so as to exclude the company's equities or rights. There may be a form of debenture which excludes a registry in favor of a transferee of the company's rights against the transferor, although registration of the transfer has not yet taken place, but a debenture in the form before me is only a protection to the transferee when he has got upon the registry.''

Another English case is that of *Re The Colonial General Gas Company*, 20 L. T., 40. In that case the bonds were made payable to ''Knight, his executors, administrators or registered assigns.'' It was provided that the transfers should be upon forms to be procured at the office of the Company, and they were to be produced there for the purposes of registration. It appeared, however, that the Company had abandoned its registration of bonds, and it was contended that the

Morgan Bros. v. Coal & Iron Co.

bonds were taken by the transferee subject to equities between the original holder and the Company for the reason that the bonds were not registered. The holding of the court was, however, that since the Company had abandoned its registration that the transferee—

"must be conceded to have taken the debentures free from all equities, and the subsequent transferees cannot be held liable in respect to the Company's demand against Knight."

In *Re Northern Assam Tea Company*, 10 L. R. Equity Cases, 157, it is said:

"This is a chose in action, and the assignment of a chose in action is taken subject to equities, but any person may release those equities who is entitled to the benefit of them, and he may do so either positively, by words, or by writing, or by the whole course of his conduct."

It was held in that case that the directors of the Company had waived their rights to the equity by their course of conduct.

Quite a number of other English cases have been cited and examined, but sufficient has been said here to illustrate the rule prevailing in England.

These debentures were issued to a certain person, "or other, the registered holder for the time being." It is provided, as one of the conditions in the bond, that they will be paid without regard to any equities existing between the Company and any intermediate holder. Nothing could be plainer than that the Company

was intending to contract on the face of the bonds that any equities existing between it and the original holder, or any intermediate holder, was waived in favor of the registered holder thereof. It was entirely competent, in our judgment, for the parties to so contract, and, having done so, and these bonds having passed into the hands of innocent holders for value, such innocent holder will take the same free from any equities existing between the Company and the original holder, or any intermediate holder. It is immaterial, therefore, whether the bonds were technically negotiable or not, since this element of negotiability had been specifically contracted in the instrument.

The first assignment of error upon the part of the Central Trust Company is that the court erred in holding the mortgage executed to the Central Trust Company void on the ground that it conveyed consumable property, or otherwise reserved benefits to the mortgagor; and the second and third make the question that complainants are subsequent creditors and without legal *status* to attack the mortgage. We dispose of the latter contention first.

It is conceded that the attack in this cause is being made by creditors who became such subsequent to the making and registration of this mortgage. It has been uniformly held in this State, in cases of attack upon voluntary conveyances, that they were not subject to such attack upon the part of such creditors, but only upon the part of creditors existing at the time of the making and record of the instrument. But it is insist-

ed the case at bar should rest upon different principles. In the case of voluntary conveyances the instrument is not void, but voidable; while in the case at bar, if the complainants are correct in their contention, this instrument is not a voidable instrument, but a void one.

As was said in *Tennessee National Bank* v. *Ebbert,* 9 Heisk., 165:

"We cannot see how the fact that the creditors were subsequent creditors could have any bearing on the question involved in that case, as we think, by the great weight of authority, the deed was fraudulent on its face, and notice of the deed by registration could only be notice of a void deed, one fraudulent as to all creditors, and therefore not in the way of any creditor. The fact that the creditor was subsequent to the registration of the deed would have been of importance, perhaps, had the deed been attacked as a voluntary conveyance or assignment as in case of *Martin v. Oliver,* 9 Humph., 565, 49 Am. Dec., 717."

In the foregoing case attack was made upon an instrument conveying a stock of goods and merchandise the possession and use of which was reserved in the grantor, and it was held void, and, as before stated, it was held that it was subject to attack by subsequent creditors.

The rule is thus stated by Bigelow in his work on Fraudulent Conveyances, sec. 288:

"The suggestion in the case under consideration that the mortgage was notice of the transaction has not much force, for the question is whether the trans-

action of which notice is given is lawful. If it is unlawful, notice of the fact is of no avail, and it is apprehended that the position taken by the supreme court of the United States and other courts, that due registration does not make lawful what before and apart from want of delivery was unlawful, is incontestable."

In *Scott* v. *Keane,* 87 Md., 723, 40 Atl., 1070, 42 L. R. A., 359, the court said:

"But in addition to that, if recording the deed gives constructive notice—as it may be admitted it does—is it to be said that it is only notice of the transfer, and not of the purposes declared on its face, which the law pronounces fraudulent and hence makes the deed invalid against them? Such a doctrine would have the tendency to make the public records an asylum for fraud, instead of means to avoid it, as they are intended to be."

In the case of *Gilbert* v. *Peppers,* 65 W. Va., 355, 64 S. E., 361, 36 L. R. A. (N. S.), 1181, it was held that where a deed was subject to attack for fraud upon its face, it might be attacked by either existing or subsequent creditors.

But we think our own case of *Bank* v. *Watkins,* 126 Tenn. (18 Cates), 453, 150 S. W., 96, settles the principle involved in this inquiry. In this case the deed was attacked and the attack was sustained upon the ground that upon its face it appeared to be a fraudulent scheme for the covering up of the property of the grantor and placing it beyond the reach of creditors. This court said:

"It is argued from this that the complainant, being a subsequent creditor at large, is entitled to no relief, upon the authority of *McKeldin* v. *Gouldy,* 91 Tenn., 677, 20 S. W., 231. Whether this is true depends upon the legal effect to be given to the deed of trust. If the deed is valid, the trust created is. an active one. . . . But if the deed of trust is a fraudulent conveyance of the property, or merely a device resorted to for the purpose of hindering and delaying creditors, a creditor at large may file his bill in the chancery court and subject the property to the satisfaction of his debt."

We think the principle announced in this case is applicable to and decisive of the question in the case at bar. The attack upon this trust deed is upon the theory that upon its face it is a fraudulent scheme to cover up the property of this debtor from its creditors, and as such that it is null and void. That being true, the registration of it which gave notice to subsequent creditors of its existence likewise gave notice to such creditors of its fraudulent intent and its consequent invalidity, and we can see no good reason why the subsequent creditors may not attack it.

We now examine the mortgage to determine whether it is subject to the criticism offered.

It first conveys by specific description various tracts of real estate situated in Rhea and Meigs counties, Tenn., and in Georgia, and thereupon proceeds to convey:

"All blast furnaces, buildings, structures, fixtures, furniture, improvements, animals, machinery, tools, utensils, wagons, stores, equipments, implements, rails, railways, railroads and tramroads now owned or hereafter acquired by the Dayton Coal & Iron Company, Limited; all lands under water and all riparian rights at any time owned by the said Company; also all stocks, certificates of stock, bonds, beneficial certificates, evidences of indebtedness and certificates of every kind and description which the Dayton Coal & Iron Company, Limited, now owns or may hereafter acquire, including its uncalled capital for the time being; all leases, leasehold estates, rights, royalties, contracts, agreements, patents and choses in action now owned or hereafter acquired by the Dayton Coal & Iron Company, Limited, whether situated in the States of Tennessee and Georgia, or elsewhere, and both that now owned and that hereafter acquired; all mines, mining rights, minerals, and ore mined or unmined, rights of way and easements now owned or hereafter acquired by the Dayton Coal & Iron Company, Limited; also all rents, royalties, dividends and increases of every kind and description, incomes, issues and profits from any and all the property in this mortgage or deed of trust described, whether now owned or hereafter acquired by the Dayton Coal & Iron Company, Limited, as the same shall accrue, and from each and every part thereof; also all the corporate and other franchises, privileges, rights and immunities of every kind and character now owned, possessed or enjoyed, or

which hereafter may be acquired, owned, possessed or enjoyed by the Dayton Coal & Iron Company, Limited, and all other property and estate, wheresover situate, and all rights and titles, interests and estates of whatever kind, character or description now belonging to or which may hereafter be acquired, owned or possessed by the Dayton Coal & Iron Company, Limited, or to which it may now or hereafter be entitled.''

Under the following article of the mortgage it is provided:

''The Dayton Company further covenants and a-grees at all times diligently to preserve all the rights and franchises now possessed by it or which it may hereafter acquire, and at all times to do all things that may be necessary to preserve and maintain the lands and property hereby conveyed, and from time to time to make all needful and proper repairs, renewals, replacements; useful and proper alterations, additions, betterments and improvements, to the end that the value of the security for the debentures to be issued under this indenture shall never become impaired.''

Under article 3 it is provided as follows: ''Until default shall be made by the Dayton Company in the payment of the principal or interest of the debentures issued under this indenture, or until some act, promise, stipulation, covenant or agreement herein required by it to be done, performed or kept, and the continuance of such default for the period of six calendar months, the Dayton Company shall be suffered and permitted to possess, manage, operate and enjoy the property, rights

and franchises hereby conveyed and assigned, and to take and apply to its own use the tolls, incomes, revenues, proceeds, rents, issues and profits thereof in any manner not inconsistent with the provisions of this indenture, as if this indenture had never been made.''

Under article 4 it is provided as follows: ''In case default shall be made in the payment of the interest on any of the debentures issued under this indenture, according to the tenor thereof, or in the performance of any other act, promise, stipulation, covenant or agreement herein contained to be done, performed or kept by the Dayton Company, and if any such default shall continue for the period of six calendar months, then and in every such case the trustee may, either personally or by its attorneys or agents, enter into, upon, and take possession of all and singular the lands, stocks, securities, property, rights and franchises hereby conveyed and assigned, or intended so to be, and each and all and every part thereof, and wholly exclude the Dayton Company and its agents therefrom, and have, hold, use and enjoy the same, as the Dayton Company could or might have done if this indenture had not been made, using, leasing, selling, operating, managing and voting upon its managers, superintendents, receivers or servants, or other attorneys or agents, the said lands, stock, securities and property, and conducting the business thereof, and exercising the franchises pertaining thereto, and making from time to time all needful repairs, replacements and such useful alterations, additions and improvements thereon and thereto

as may seem to it necessary or judicious, and collect and receive all tolls, dividends, interest, incomes, rents, issues and profits of the same, and of each and all of them; and after deducting the expenses of operating and managing the said lands and property and of conducting the business thereof and of all the said repairs, replacements, alterations, additions and improvements, and all payments which may have been made for taxes, assessments, royalties, charges or liens prior to the lien of this indenture upon the said lands or property, or any part thereof, or upon lands or property upon which the Dayton Company shall have a mortgage or or other charge or lien, as well as a just compensation for its own services, shall apply the residue of the moneys received as aforesaid equally and ratably to the payment of the interest then in default upon the said debentures, in the order in which said interest shall have become due, and then to the payment of any remaining obligations of the Dayton Company, in respect to which default shall have been made as aforesaid, ratably and without preference or priority of one obligation over another. If the residue of the moneys coming into the hands of the trustee as aforesaid shall suffice to discharge the obligations in respect to which such default shall have been made, and if the principal of the said bonds shall not have become due, either by the maturity thereof, according to their tenor, or by the exercise of the election to declare the principal thereof to be due, then the trustee, after the discharge of all such obligations in respect to which default shall

have been made as aforesaid, shall pay over any surplus that may remain, and restore the possession, management and control of all the said lands, property, stocks, securities, rights and franchises, in the condition in which the same shall then be, to the Dayton Company; subject, however, to all the provisions, covenants and conditions of this indenture, which shall thenceforth have the same force and effect as if no such default had occurred.''

It is contended on behalf of the complainants that the conveyance of stocks, certificates of stocks, bonds, beneficial certificates, evidences of indebtedness, etc., and also leases, leasehold estates, rights, royalties, contracts, agreements, etc., is of property consumable in its use and that the retention of possession and use in the mortgagor is inconsistent with this mortgage and the security thereof to such an extent as renders it void. It is further contended that the clause ''all property, and estate wherever situate,'' etc., includes property necessarily consumable in its use, such as commissaries, ores, manufactured products, etc., and the retention of the rights in the mortgagor to use and enjoy the same is inconsistent with the mortgage, and therefore renders the mortgage void.

First, as to the rule of construction to be applied in the examination of this instrument, the court will not, unless constrained to do so by the terms of the instrument considered in the light of the surrounding circumstances, give to it such interpretation as would make

it void. As was said by this court in the recent case of
*Gernt* v. *Floyd,* 131 Tenn., 122, 174 S. W., 267:

"Instead of being astute to find some possibility
that might, when taken into consideration, render the
deed void, it was the duty of the court to uphold the
deed if by any reasonable construction it was possible
to ascertain from the description what property it was
intended by it to convey, and a liberal construction
should have been given to afford a basis for validity."

It is argued with much plausibility on part of com-
plainants that the words "all other property wherever
situate," in the conveying clause of this deed, must be
construed to mean literally every kind and character
of property owned by this corporation, which would
include some $35,000 in cash on hand at the time of
the execution of the conveyance, commissary stock, in-
ventoried at about $37,000, iron ore, coke, and lime-
stone, about $68,000, about $10,000 worth of pig iron,
and about $160,000 in face value of accounts receivable,
and that these properties, though not specifically de-
scribed in the deed, were thus included by implication
and covered up from creditors, and that this renders
the mortgage fraudulent and void.

We have already reached the conclusion in this case
that this mortgage is subject to attack by creditors
who become such subsequent to the making and regis-
tration of the mortgage upon the theory that the mort-
gage, if invalid upon its face, while carrying notice to
subsequent creditors of its existence, likewise carried
notice to such creditors of its invalidity. It is quite

clear, therefore, that if the mortgage upon its face is valid—that is to say, if the property which is described in the face of the mortgage is not of such nature as to make it fraudulent and void—then it could not be attacked by subsequent creditors upon the ground that the general conveying clause included property not proper to be mortgaged and possession and use of same reserved to the grantor.

Furthermore, we do not think this is the proper construction to be placed upon the instrument. It contains an elaborate description of the properties owned by this Company, such as mineral lands, furnaces, equipment, etc., and follows the same with a general provision "all property and estate wherever situate," and, manifestly, we think, that this clause was intended to refer to all property of a similar nature, which may have been overlooked in the detailed description already referred to. Furthermore, as shown in the discussion of the next question, the whole scope of this instrument negatives such idea. The evident purpose of this instrument, taken as a whole, is to convey to the Trust Company for the security of the bonds the plant, equipments, mines, and real estate of the Company, and to reserve to the Company the right until default and entry by the trustee to such use of it as will be necessary and proper in the carrying on of its corporate business, to wit, the mining of ores, minerals, etc., and the manufacture and sale of pig iron. The court will not presume, without the very strongest reasons appearing in the mortgage and surrounding circumstan-

ces that the parties intended to contravene the rules of law or create a forfeiture. Unless there is contained within this instrument convincing evidence of such intention therefore, the court will not presume that the parties intended to include within the terms of this trust deed property of such nature as to contravene the rules of law, and in this way to destroy the instrument.

The property conveyed is described fully and specifically—indeed the mortgage is full and detailed in its provisions—and the evident intention of the draftsman of the instrument was to include in the general conveying clause any property of the same character which may have been overlooked. The property in question is too conspicuous to have been overlooked if it had been the intention to convey it. Further, as will be hereinafter shown, the recitals in the instrument taken as a whole rebut the idea that there was any intention to convey property which was to be sold in the conduct of the business of the corporation.

Furthermore, the rule *ejusdem generis* is clearly applicable to the facts of this case. This rule of construction finds illustration in numerous English and American cases, as well as in the text-books. It is thus defined in Anderson's Dictionary, page 394:

"In the construction of statutes, contracts, and other instruments, where an enumeration of specific things is followed by a general word or phrase, the latter is held to refer to things of the same kind as those specified."

It is thus aptly stated in English Ruling Cases, vol. 14, page 717:

"Where, after an enumeration of particulars, there is a sweeping clause comprising all other things under a general description, the scope of such clause is restricted to things within the description of the same kind with the particulars enumerated."

It is thus stated in Broom's Legal Maxims, page 412:

"It is very common, moreover, to put in a sweeping clause, the use and object of which are to guard against any accidental omission; but in such cases it is meant to refer to a *status* or things of the same nature and description with those already mentioned, and such general words are not allowed to extend further than was clearly intended by the parties."

In our own case of *Williams* v. *Williams,* 10 Yerg., 26, it is said:

"The great rule in the construction of wills, to which this one of *ejusdem generis* and all others, except those founded upon public policy, are not only subordinate, but ancillary, is that the intention of the testator, to be ascertained from the particular words used, from the context, and from the general scope and purpose of the instrument, is to prevail and have effect. In an enumeration of particulars, general and comprehensive terms are sometimes used, in the construction of which, reason and good sense require that, if you would not violate the intention of the writer, their meaning must be restricted to things of a like nature and description, with the particulars among which they are found."

See, also, *Lynchburg* v. *N. & W. R. R. Co.,* 80 Va., 249, 56 Am. Rep., 592; *Benton* v. *Benton,* 63 N. H., 289, 56 Am. Rep., 512.

The next question arising is, does the mortgage in its specific description convey property consumable in its use, or property of such character that the reservation of possession and use of same is inconsistent with the security of the mortgage?

Reviewing our authorities upon the subject: We have in Tennessee a long line of decisions, beginning with *Darwin* v. *Handley,* 3 Yerg., 502, and extending down to *Bank* v. *Brier,* 11 Pick., 331, 32 S. W., 205, which denounce as unlawful such conveyances of property, consumable in the use, where the possession is reserved in the mortgagor.

In *Darwin* v. *Handley,* 3 Yerg., 502, the trust deed covered corn and pork and other provisions, and the grantor was permitted to remain in possession and use of it. The court said:

"Creditors, or those bound as security for other persons, cannot be permitted to secure their honest debts on the debtor's property, and at the same time to cover his remaining all from every other creditor, with the intent to let the debtor use and exhaust his means of payment, reserving the object secretly intended to be applied to the mortgagee's debt. Hence it is that the face of the courts has always been so strongly set against these sweepings deeds. And it would make no difference if it were expressed on the face of the deed that the debtor was to retain the possession of the pro-

perty. 2 Kent's Com., 412, 419. The very circumstance that he must necessarily consume the provisions, etc., would be a badge of fraud, so strong as to be almost conclusive, not as a matter of law but of fact with the jury, that the deed was fraudulent."

*Sommerville* v. *Horton,* 4 Yerg., 549, 26 Am. Dec., 242, was a case where the mortgage covered whisky, flour, sugar, coffee, bacon, etc. The court said:

"But this deed is void by its terms. The great portion of the property covered by it, if used, must have been exhausted. Kingsley, the debtor, so far as respected that trust, reserved the power to use and destroy the fund, and did destroy much the greater part of it; nor had the trustees any right to restrain him, contrary to their explicit covenant 'that he might use the articles.' Of course, the deed was for Kingsley's benefit; it was a holding in trust for him, not the bank. In such a case we might safely appeal to our perceptions of right and wrong, which are independent of all learning, and declare a deed, neither changing the possession of property, nor prohibiting the owner from selling or exhausting it in the use, merely colorable and void, because in fact it had no operation. Authorities are abundant to this effect. *Austin* v. *Bell,* 20 Johns. (N. Y.), 446, 11 Am. Dec., 297; *Mackie* v. *Cairns,* 5 Cow. (N. Y.), 566, 15 Am. Dec., 477."

*Maney* v. *Killough,* 7 Yerg., 440, was a mortgage covering lands, negroes, horses, cattle, and furniture. The court held that the retention of possession of these articles by the mortgagor was not *prima facie* fraudu-

lent, because they were not necessarily consumable in their use.

To the same effect is *Ross* v. *Young,* 5 Sneed, 629.

*Masson* v. *Anderson,* 3 Baxt., 290, was a conveyance of personal property alleged to be consumable in use with possession retained by the mortgagor. The court held that it was not, in these words:

"The property conveyed is not necessarily consumable in its use, the property being described in the deed as follows: 'All my cattle, including milk stock, sheep, hogs, stock, pork hogs, sixteen head of horses, mules and colts.' This is not a stronger case than *Ross* v. *Young et al.,* 5 Sneed, 629, which was a conveyance of 'ten head of young cattle, twenty head of hogs, thirteen old sheep, two bee palaces, and two kegs of vinegar.'

"We do not think the principle of raising a fraudulent intent from such a conveyance of property, coupled with retention of possession by the maker of the deed, until default of payment, should be extended beyond what the above case has laid down. There is no stipulation in the deed for the use of the property (that is, its consumption) for the benefit of the maker of the deed, but only one, that 'the crops conveyed may be used in getting the stock ready for market.' This is for the benefit of the trust fund, and not for the maker of it.

"In addition to this, the provision for retaining the possession of the property until expiration of the trust is qualified by the stipulation, 'unless the trustee may

deem it best, for the interest of the trust,' to take possession.''

*Doyle* v. *Smith,* 1 Cold., 15, was a mortgage upon a stock of merchandise with authority in the trustee to continue business for an indefinite time. In holding it void this court said:

''The law does not permit a debtor, in failing circumstances, to convey all his property to trustees, so as to exempt it from execution for an indefinite time. . . . It is a settled rule of decision in such cases that any provision which materially hinders and delays creditors in the assertion of their rights, especially when coupled with a reservation of any part of the property to the grantor in the deed, makes the whole void. . . .

. ''It is, however, difficult, indeed, impossible, to lay down any precise and definite rule applicable in all cases. If the deed may be good, if it does not plainly appear upon its face to be fraudulent, it is the duty of the court to suffer the jury to pass upon it. Undoubtedly a party not indebted may make an arrangement like that involved in this assignment, and so he may, with the assent of his creditors, however numerous. *Bodley et al.* v. *Goodrich,* 7 How., 276—278, 12 L. Ed., 699. But if he be indebted, can he do so without the sanction of his creditors? We think not. It seems to us that there is sufficient upon the face of this deed of trust for the law to pronounce it fraudulent as against creditors.''

In the case of *Tennessee National Bank* v. *Elbert & Co.,* 9 Heisk., 153, the mortgage was upon a stock of goods, wares, and merchandise, with retention of pos-

session in the mortgagor, and with the right to carry on the business of merchant. This court held the mortgage null and void upon the ground that it retained in the mortgagor permanent, lasting, and material benefits, and was therefore inconsistent with the security offered by the trust deed. The court said:

"The rule we lay down in this case only requires that there be a *bona fide* and certain appropriation of the property for the benefit of a creditor, not a colorable one in which the creditors have only a contingent interest, dependent on the good faith of the assignor, while the assignor himself has an equally certain interest secured to him; that is, he may carry on his business as before, and reap all its profits, subject only to the danger of having what he has not used for his own benefit taken by the trustee and sold, when it is ascertained he has so used it."

So in the case of *Bank of Rome* v. *Haselton,* 15 Lea, 237, it was declared that the mortgage upon the stock of goods retaining possession and right of disposition in the mortgagor is void. To the same effect is *Lowenstein Bros.* v. *Love,* 16 Lea, 660; to the same effect is *Bank* v. *Brier,* 95 Tenn. (11 Pick.), 331, 32 S. W., 205.

It seems, therefore, to be thoroughly settled in Tennessee, as indeed it is in many of the States, that a mortgage given upon property necessarily consumable in its use, where the possession and right of user is reserved in the grantor, is null and void; also that a mortgage upon a stock of goods, where the right of possess-

ion and user, in the usual course of business, is retained in the mortgagor, is null and void. However, it does not necessarily follow that the inclusion in a mortgage of property which may be consumed in its use, though not necessarily so, must render the mortgage of necessity void. This would depend upon the facts of each particular case, and whether the possession and user is inconsistent with the security given by the mortgage; whether its retention by the mortgagor is the reservation of rights to him wholly inconsistent with those conveyed to the mortgagee, and manifestly for his benefit.

In *Bank* v. *Erwin*, 2 Shan. Cas., page 444, it is said:

"In a conveyance to a trustee, the simple fact that property consumable in its use is embraced in the deed would not, of itself, be conclusive evidence of fraud, unless it was stipulated in the deed that it should remain in the possession and use of the grantor, as in the case of *Wade et al.* v. *Green*, 3 Humph., 549, and *Sommerville* v. *Horton*, 4 Yerg., 550, 26 Am. Dec., 242. In this last, Catron, Judge, states the principle correctly, that if the deed was intended to secure the use of the property to the grantor, such property being consumable in its use, then, as to these articles, it was fraudulent and void, on the principle a creditor cannot secure his honest debts on the property of his debtor, with the intent to let the debtor use and exhaust means of payment, reserving the object secretly intended to be applied to the discharge of the mortgage debt."

Another line of cases, very nearly bordering upon the question here presented, arises largely, though not exclusively, out of the construction and enforcement of mortgages upon railway properties.

The case of *New York Security & Trust Co.* v. *Saratoga Gas & Electric Light Company,* 159 N. Y., 137, 53 N. E., 758, 45 L. R. A., 132, from the court of appeals of New York. The following excerpt from the court's opinion quotes provisions of the mortgage pertinent:

"The property covered by the mortgage is described therein as follows: 'All the corporate property, real, personal, and mixed, including all lands, easements, rights of way, buildings, fixtures, materials, supplies, machinery, and plant, franchises, contracts, and choses in action, whether now owned or hereafter acquired or constructed by said Gas Company, together with the appurtenances thereto, and all rents, tolls, issues, income, and profits of said Gas Company, present and future; to have and to hold the same unto said American Loan & Trust Company, its successors and assigns, forever, upon trust for the equal benefit and security of all holders of said bonds, and subject to the following covenants, conditions, and provisions, which are assented to by both parties, to wit,' etc. It must, I think, be admitted that this language is broad enough to cover, not only all the property that the corporation then had, but all that it ever could have by any possibility, whether lands, chattels, moneys, or things in action. But the language here used, broad and comprehensive

134 Tenn. 18

as it is, is very much qualified and restricted by other provisions of the instrument, as will be seen by reference to the following stipulations: (1) 'Until default occurs in some duty, or upon some covenant, agreement, or promise of the Gas Company hereunder, said Gas Company, its successors and assigns, shall retain the possession, control, and enjoyment of all the property and franchises hereby mortgaged, and may receive and use the earnings, income, and profits thereof in any manner not inconsistent with these presents, nor tending to lessen the security hereby provided.' "

It will be observed that the provisions quoted are remarkably similar to those in the mortgage under consideration in this case.

With respect to the proper construction to be given to the provision of the mortgage in question, the court said:

"Where a mortgage by a corporation to secure the payment of the principal and interest of its bonds, such as this is, is made, although in terms purporting to include future earnings and products, it does not, as against general creditors, operate as a lien upon such earnings until actual entry and possession under the mortgage by the mortgagee. This results from the stipulation in the instrument that until default the mortgagor shall have the use of the earnings in the conduct of its business, and that upon default the mortgagee may go into possession, exercise the corporate franchises, and appropriate the earnings to the pay-

ment of the debt secured by the mortgage. The right of the mortgagor in the meantime to the use of the earnings amounts, practically, to absolute ownership, and hence the mortgage cannot operate as a lien upon such earnings, to the prejudice of the general creditors, until actual entry and possession taken, and, then only upon what is earned after that time. The lien of the mortgage upon future earnings is consummated as against other creditors only by the fact of the possession of the property, and cannot have any retroactive operation, since it would then deprive the unsecured creditor of the fund, upon the faith of which he may have given credit to the mortgagor during the time when the latter was permitted to deal with and use it as his own. The lien upon the earnings in favor of the bondholders attaches only upon what is earned after the time when the lien is perfected by entry and possession. This is the construction which has been given to corporate mortgages, expressed in substantially the same terms, by the supreme court of the United States, by the English Courts, and by the highest courts of many of our sister States.''

In *Alabama National Bank* v. *Mary Lee Coal & Ry. Co. et al.,* 108 Ala., 288, 19 South., 404, the court takes a similar view of the language contained in the trust deed.

In *Johnston and Stewart* v. *Riddle,* 70 Ala., 219, it was held that the provision in the mortgage purporting to cover tolls, incomes, issues, and profits, where it appears from the instrument that the Railroad Com-

pany was to remain in possession of the property was meant to apply only to such rents, tolls, etc., as accrued after default and after the trustee took possession of the property under the power contained in the trust deed. Similar ruling was made in *American Bridge Co.* v. *Heidelbach,* 94 U. S., 798, 24 L. Ed., 144; also *Fosdick* v. *Schall,* 99 U. S., 235, 25 L. Ed., 339; also *United States Trust Company* v. *Wabash Ry.,* 150 U. S. 307, 14 Sup. Ct., 86, 37 L. Ed., 1085. Indeed the holdings of our own cases are to the same effect.

In *Clay* v. *Railroad Co.,* 6 Heisk., 421, the mortgage contained provisions very similar to those in the mortgage in the case at bar. We quote from the opinion in that case:

"We proceed to consider the several grounds of demurrer relied on in this court for supporting the ruling of the chancellor.

"(1) Because the deeds of trust under which complainants claim are in law fraudulent and void.

"The property conveyed by the Virginia and Tennessee Railroad Company to complainants is thus described in the deeds: 'The depot grounds and other lands acquired by said parties of the first part, for the purpose of the said road, the roadbed, superstructure, iron, cars, engines, locomotives, tenders and other things used in the management and business of the said road; also, all the franchises, appurtenances and privileges owned and to be owned by the said parties of the first part, at and between the said termini (Lynchburg and Bristol) ; and also property, rights and

interests of every kind which the said parties of the first part may hereafter acquire, except such as may be acquired under authority to construct arms to said railroad other than those authorized by the original charter and the amendments thereto, and heretofore constructed, together with all tolls, issues, income and profits, which may be derived from the uses of the said road, or any part thereof, and from the after-acquired property, rights and interests, with the exception just stated.'

"The conditions of the conveyance are then stated, with a recital of the bonds intended to be secured, as follows: 'And in case the parties of the first part shall fail to pay the principal of the said bonds, or any part thereof, or the interest thereon, as the same may become due and payable, when demanded, according to the tenor thereof, then after ninety days from such demand and default made, upon the request of the holder or holders of one-fourth in the amount of the said bonds, the said trustees or their successors shall take possession of all or any part of the premises and property hereby granted, and by themselves or their agents, or substitutes duly constituted, have, use, and employ the same, according to the rules and regulations and lawful directions of the president and directors of the said company, and receive and collect the tolls, rents, income and profits of the said railroad and its appurtenances, and after defraying the expenses,' etc.

"In construing this portion of the trust deed, it is proper that we recur to the circumstances under which,

and the purposes for which, the bonds were executed by the company and secured by the trust deeds. They had entered upon a great enterprise in the construction of a railroad from Lynchburg, in Virginia, to Bristol, on the border of Tennessee. This object could only be effected by raising money on the credit of the company, and to effect this it was necessary to issue their bonds payable at distant periods, but with the interest payable semiannually. To induce capitalists to make investments in their bonds, it was necessary that they should be fully indemnified and secured by mortgages on the property of the company. The leading object of the capitalists was to have the interest promptly paid, and the ultimate payment of the bonds fully secured.

"The object of that provision of the deed . . . quoted was to secure the prompt payment of the interest. To effect this the trustees are empowered, in case of default, to take possession of the road, and to operate it by themselves or agents, for the purpose of appropriating the income or profits to the satisfaction of the unpaid interest. To this provision no just exception can be taken. No presumption of fraud can arise, either from the use of the road by the company, for the purpose of raising the means of paying the interest as it accrues, or the bonds as they fall due; nor can any such presumption of fraud be deduced from the use of the road by the trustees or their agents, after default of payment of interest, for the purpose of provid-

ing the means of meeting the interest or paying the bonds.''

We hold the rule to be:

That a mortgage upon property necessarily consumable in its use, where possession and use is reserved in the grantor, is fraudulent upon its face and void.

A mortgage upon a stock of merchandise, with possession and right to continue business reserved to the mortgagor, is fraudulent upon its face and void, because inconsistent with the security afforded by the mortgage, and manifestly for the benefit and advantage of the mortgagor.

That in the case of a mortgage upon personalty, not necessarily consumable in its use, where possession and right to use the same is reserved in the grantor, the same will not be held invalid, unless it appears from the instrument, taken as a whole, that the reservation is inconsistent with the purposes of the instrument and for the benefit and advantage of the grantor.

In the case of a mortgage by a going concern, e. g., a mining or manufacturing plant, of its real estate plant and equipment, together with its income, issues, and profits, choses in action, etc., where there is a right of user and enjoyment reserved the grantor until default, and where the mortgagee has the right to enter and take charge of the plant and operate it for the purpose of discharging the mortgage debt, the income, issues, profits, etc., do not pass under the lien of the mortgage until default and possession thereunder by the trustee, and then the lien only attaches to such income,

issues, etc., as arise after default and possession thus taken.

The late case of *Knapp* v. *Milwaukee Trust Company*, 216 U. S., 552, 30 Sup. Ct., 412, 54 L. Ed., 610, to which we are referred by complainants, is in line with the principles herein announced. In that case the bankrupt was engaged in the business of selling appliances for telephone purposes and operating telephone exchanges. It is stated in the opinion of the court that the mortgage covered all of the property and estate of the mortgagor acquired or to be acquired with, or in relation to the business of the mortgagor, and contained the following provision:

"Nothing herein contained shall be construed to prevent said first party from carrying on, in the due and regular course, its said business and collecting the indebtedness and moneys due or to become due therein and applying the same to its own use except as hereinafter provided."

It appeared that the business of the mortgagor was the sale of appliances for telephone purposes. A mortgage covering such appliances and reserving the possession of the same in the mortgagor with the right to continue to sell them and collect the money was manifestly inconsistent with the purposes of the mortgage, and falls under the same ban as a mortgage upon a stock of goods.

We now examine the mortgage in this case to determine whether or not, under the principles announced, it is subject to the criticism offered.

The Dayton Coal & Iron Company, Limited, was a corporation engaged in the business of the manufacture and sale of pig iron, and owned and operated various blast furnaces, mines, etc. It was necessary in the conduct of its business that it have possession of its property, including its furnaces and equipment of all kinds, and it was also necessary, if it continued actively in business, that it have the right to use its income, issues, and profits arising from its operations, including its accounts, rentals, choses in action, etc. It was, of course, not inconsistent with the security of the mortgage that until default it have the possession, use, and enjoyment of its plant and equipment; it was likewise not inconsistent with the security afforded by the mortgage that it have the benefits arising from the operations of its plant, including its income of every character. We hold that under a proper construction of the mortgage the lien did not attach, and was not intended to attach, to the income, issues, profits, accounts, choses in action, etc., until default and possession taken under the mortgage, as provided therein.

Now, taking the mortgage as a whole, with all of these various provisions, does it indicate that the reservations therein are made for the benefit of the mortgagor and for the purpose of covering up its property from its other creditors? We think not, but that such possession, use, and enjoyment reserved to the mortgagor was not only not for his exclusive advantage and benefit, but was manifestly in furtherance of the security afforded by the mortgage. We do not concur in

the position taken by counsel for the trustee, and which is supported by some text-writers, that a different rule necessarily applies to mortgages made by corporations from those made by individuals. In our view, the court will take into consideration the character of business which the mortgagor is engaged in, the character of property used in that business, and the necessities for such user, and from a consideration thereof in the light of surrounding circumstances, and from an inspection of the instrument in all its parts, determine whether or not the purpose of the instrument is fraudulent. The reservation in this case was a necessary one if the mortgagor was to be allowed to continue its business— indeed, it could not be expected to meet its interest payments as provided in the mortgage, or to meet the mortgage when due, unless permitted to have the use and enjoyment of this property, together with its income, issues, and increases. It-is apparent, therefore, that the reservations are not inconsistent with the trust, but in furtherance of it. The decree of the chancellor and of the court of appeals holding to the contrary is reversed.

The case is also brought here upon the petition of the Bank of Montreal, which complains of that portion of the chancellor's decree giving preference to Tennessee corporations over the claim of said Bank of Montreal. The decree of the chancellor was founded upon chapter 31, section 5, of the Acts of 1877, which was construed by this court in *McClung* v. *Embreeville, etc., Company,* 103 Tenn. (19 Pick.), 399, 52 S. W.,

1001, and by the supreme court of the United States in the case of *Blake* v. *McClung*, 172 U. S., 239, 19 Sup. Ct., 165, 43 L. Ed., 432. In the above case this court sustained said act to the extent of holding that creditors of foreign countries and corporations of another State would be deferred thereunder to the Tennessee creditors.

The supreme court of the United States affirmed the decision of this court in so far as it held that the nonresident corporation would be deferred to the payment of Tennessee creditors. The claim is now made that the said statute is a violation of the treaty rights between the United States and Great Britain. We are cited to the second article of the Hay-Pauncefote Treaty, which is as follows:

"The citizens or subjects of each of the contracting parties shall have full power to dispose of their personal property within the territories of the other, by testament, donation, or otherwise; and their heirs, legatees, and donees, being citizens or subjects of the other contracting party, whether resident or nonresident, shall succeed to their said personal property, and may take possession thereof either by themselves or by others acting for them, and dispose of the same at their pleasure, paying such duties only as the citizens or subjects of the country where the property lies shall be liable to pay in like cases." 31 Stat., 1939.

We think it is manifest from the reading thereof that it has no application to the question under considera-

tion, but refers alone to the disposition, testamentary or otherwise, of personal property owned by subjects of either the United States or Great Britain in the country of the other. This disposes of this assignment, and the decree in that respect is affirmed.