## SILAS WILLIAMS v. FIRST NATIONAL BANK.*

### (*Nashville.* December Term, 1923.)

1. **FRAUDULENT CONVEYANCES.** Transaction secretly pledging lumber, possession of which retained by pledgor, held fraudulent.

Where pledgor of lumber remained in actual possession of lumber-yard in which lumber stored, carried on business of lumber dealer, bought and sold at will with outward show of ownership, and was enabled to incur additional debts, neither lease of yard to pledgee nor contracts pledging lumber having been recorded, *held*, that pledge was fraudulent. ' (*Post, pp.* 16-23.)

Cases cited and approved: · Morgan Bros. v. Dayton Coal & Iron Co., 134 Tenn., 267; National Bank v. Ebbert, 56 Tenn., 153; Bank v. Brier, 95 Tenn., 335.

2. **BANKRUPTCY.** Bank's acceptance of payment of debt without knowledge of debtor's other debts held not preference.

Where bank, without knowledge of debtor's other debts or bankrupt condition, accepted payment of debt in regular course of business as it had done through entire period of dealing with debtor, pay-ment *held* not preference. (*Post, pp.* 23, 24.)

---

*Headnotes 1. Bankruptcy, 7 C. J., sections 282, 283; 2. Bankruptcy, 7 C. J., section 264.

---

FROM HAMILTON.

---

ˎ Appeal from the Chancery Court of Hamilton County. —HON. W. B. GARVIN, Judge.

LUSK & THOMPSON, FINLAY & CAMPBELL and MILLER, MILLER & MARTIN, for plaintiff.

WILLIAMS & LANCASTER, for defendant.

---

*On right of bank to set off deposit of bankrupt depositor against indebtedness due the bank, see note in 55 L. R. A., 48.

MR. JUSTICE COOK delivered the opinion of the Court.

Complainant, trustee in bankruptcy, sues for $4,792.01, the value of lumber alleged to be assets of F. W. Blair bankrupt, appropriated by the bank under a contract alleged to be void, and for an alleged preference of $1,384.50 paid by Blair to the bank. Both transactions occurred within four months of the adjudication in bankruptcy. their dealings date from June 1, 1909, and before, when Blair owed the bank $40,000. This liability was reduced to $15,000 by application of proceeds of certain land on which the bank held a mortgage. A further payment reduced the debt to $12,800, and Blair assigned a life insurance policy and executed a mortgage on his home which secured $5,000 of the debt, leaving $7,850 of unsecured indebtedness to the bank when a $3,000 credit was extended to enable Blair to deal in lumber. An arrangement was then made which invites this litigation.

A lot was leased in the name of the bank to be used as a lumberyard. A written contract was executed reciting that the bank was owner of certain lumber, described and valued in the contract, on sticks—that is, stacked—on a yard leased by the bank, which Blair desired to handle as a means of making profits and reducing his debt to the bank. He was to take possession of the lumber, dispose of it, deduct expenses for handling, and apply the profits upon the indebtedness mentioned in the contract. Invoices covering sales were to be delivered, and bills receivable paid to the bank in settlement of lumber sold. A succession of similar contracts ran from June 1, 1909, to May 15, 1915.

Blucher Blair testifies that these contracts were made every three or four months. The last contract, which covers the lumber in controversy, fixes the cost of the lumber at $4,792.01, authorizes Blair to handle it, and recites:

"The said Blair is willing to give his services in the hope of realizing for said bank a profit out of the lumber above described, and the bank, in order to get the services of said Blair, agrees that any profit it may realize from this transaction shall be credited on the old debt owing as aforesaid by F. W. Blair to it. The said F. W. Blair is to begin immediately the sale of the lumber as listed above, and as such sales are made, he shall turn over to said bank invoices covering such sales, and the accounts receivable thus created shall be paid to the First National Bank of Chattanooga, as fast as the checks are received on the aforesaid note of $4,275.00."

The defendant does not insist that the execution of this contract without more constituted a lien, but that the lumber was actually pledged as security for the debt and put in possession of the bank on a lot leased for the purpose, and that the contract merely directed how the pledged lumber should be handled after coming into the bank's possession.

The written contract and the pledge must be considered as one, for under the facts shown in the record they are not separable. There is nothing on the face of the contract which would render it nugatory. Without more, the bank's right to the property could not be questioned. The lease of the yard where the lumber was stored runs in the name of the bank. The contract directing its disposition recites that the bank owns the lumber stacked on the yard, which Blair desires to handle at a profit to re-

duce his debt to the bank, and to that end he is authorized to sell it, and, after deducting expenses and paying the note of $4,792, apply the remainder to his indebtedness to the bank.

The contract of May 15, 1915, relates to the first arrangement between Blair and the bank in 1909. Throughout the entire period, and until Blair became bankrupt in May, 1915, he was dealing in lumber under this arrangement. No new credit was extended at the time of the last contract, but prior thereto credit was increased from $3,000 to $4,792, as shown by the note described in the contract. Throughout their course of dealings in this manner Blair was insolvent, although it seems the bank had no knowledge of indebtedness other than its own. It appears from the proof that Blair's net assets were $300. The bankruptcy schedule shows secured claims of $14,194.15, and unsecured claims of $43,506.05.

To obtain a better view of the course of dealings between the parties, we quote from the testimony of Mr. Nottingham as follows:

"I told him that we would extend his line of credit to $3,000, if we could be absolutely secured on the new money put out. That brought up the question of leasing that land from Mr. Albert, and I went to Mr. Lancaster, who drew that contract under which we operated. We told Blair that as long as he kept a sufficient amount of lumber and accounts receivable, assigned to us, we would carry him along on a line of credit. He said he could run this business profitably, and we made this advance because we knew that was the only way in which we could get out. He had always shown a disposition to pay his debts, and we thought by extending him a line of

credit he could make money in the lumber business to pay us this $7,850. Then after that on the first of the year I would see Mr. Blair and ask him how he had been getting along. . . . I think Mr. Blair has paid about $1,000 since the operation of that contract, that is supposed to have been paid by him as he was able to pay out of the profits of the business."

F. W. Blair was secretary of the Rambert Lumber Company in Georgia, and devoted all of his time to that business. His testimony does not appear in the record. Blucher Blair, who had exclusive control of his father's lumber business from the beginning, testifies that he bought logs, had them sawed into lumber by Loomis & Co., and others, which he sold in due course of business, and bought and resold lumber continuing the process from year to year; that he used the lumberyard leased from P. R. Albert in the name of the First National Bank, and occupied an office two blocks away, which bore a sign, "F. W. Blair, Lumber." He states that the lumberyard leased nominally by the bank was in fact leased by him, and that he paid the rent; that he frequently bought lumber and resold it without yarding, and sold lumber sawed from logs without yarding it; that when he took charge of the business there were practically no assets, and this fact was known to the bank. Throughout the period he made statements about every 90 days to the bank, and as lumber covered by the bank's contract was disposed of, a new contract would be executed covering more recently yarded lumber. The effect of his testimony is that the contracts were made to cover all lumber on the yard. We quote from his testimony:

"Q. Now, these contracts referred to certain lumber which was described in them; where was that lumber?

"A. It was on this yard we spoke of while ago.

"Q. What disposition did you make of that lumber; did you simply hold that lumber in storage for the bank, or did you sell it as a lumber dealer?

"A. I sold it.

"Q. Did you sell it in the usual course of your business?

"A. Yes.

"Q. Who had the control and possession of that lumberyard, you or the bank?

"A. We did—I did.

"Q. Was it accustomed to send representatives out there to check up on the lumber and see that you actually had on the yard the lumber described in the contract?

"A. If they did, I never heard of it.

"Q. Referring to this contract of May 15th, did that or not cover all of the lumber in the yard?

"A. I do not know. (Witness examines contract.) No, I do not know because there was lumber on there belonging to the Odorless Refrigerator Company and J. M. Card Lumber Company.

"Q. During all the time that you had charge of the business, except just before the time of the bankruptcy, was the lumber covered by the bank's contracts marked in any way so that people going through the yard could see that it belonged to the bank?

"A. No.

"Q. Did you at any time ever mark any of this lumber in the name of the bank?

"A. Well, I realized the business was going into bankruptcy, and I wanted to mark the different pieces of lum-

ber there so that others, and myself, would know just what was the bank's, what was the Card Lumber Company's, and what was the Odorless Refrigerator Company's.

"Q. Before marking the lumber in this way, had you or not made up a statement of the assets and liabilities of F. W. Blair?

"A. I had.

"Q. What did you conclude from that statement?

"A. That it was useless to try to go ahead.

"Q. Did you or not notify the First National Bank then that you were going to fail?

"A. I did."

"Q. During the time that you were operating the business and had these contracts with the bank, did you or not ordinarily have any lumber on the yard which was not covered by the bank's contract, or the contracts of the Card Lumber Company, and the Odorless Refrigerator Company?

"A. At times we had lumber for the Acme Kitchen Furniture Company and the Chattanooga Lumber Company, possibly some others."

The lumber covered by these contracts was sold and dealt with by Blair as his lumber, and although the invoices were ordinarily delivered to the bank as sales were made, the bills receivable were collected by Blair and proceeds deposited to his general checking account.

From the statement of Mr. Nottingham and Blucher Blair, F. W. Blair conducted this business in his own name as a lumber dealer throughout the period from 1909 under the management of his son, Blucher Blair. Contracts drawn from time to time recited that the bank was

the owner of lumber stacked on the yard which Blair was authorized to handle as a means of earning profits to pay his debt to the bank. During the course of business Blair incurred additional liabilities of $43,000 to outside creditors without materially reducing his original debt to the bank. He bought the logs, manufactured them into lumber, and sold and bought lumber at will, yarding only such as was not sold direct from the mill or from the cars, using the proceeds of sale at discretion. He kept a general account at the bank where all moneys were deposited, and on which he checked for expenses of the business, the expenses of his family, and the salary of his son, Blucher Blair.

The several contracts and attendant efforts to effectuate a pledge of the lumber in actual possession of Blair by transferring it to the constructive possession of the bank, together with the outward show of title in Blair, and his control and use of the proceeds of the business throughout the course of six years, however honest the intention of the parties, constituted a transaction which was fraudulent in law and void. *Morgan Bros.* v. *Dayton Coal & Iron Co.*, 134 Tenn., 267, 183 S. W., 1019, Ann. Cas., 1917E, 42; *National Bank* v. *Ebbert,* 9 Heisk., 153; *Bank* v. *Brier,* 95 Tenn., 335, 32 S. W., 205.

Whatever may have been the intention of the bank and F. W. Blair, the result of their transaction was to allow Blair to carry on the business of a lumber dealer, buy and sell at will with all the outward show of absolute ownership. He used the proceeds of his operations for his own purposes throughout the period from 1909 without paying or even reducing the $3,000 advanced by the bank, and was enabled to incur the additional indebtedness of

$43,000; credit being extended no doubt upon his appearance as a properous lumber dealer.

It may be noted that neither the lease on the lumberyard nor any of the contracts between Blair and the bank were recorded, and there was nothing in Blair's business methods to suggest that the bank had any claim upon the lumber placed on the yard. There is nothing to show that these contracts were known to others than the parties themselves. The law imputes to such a plan a fraudulent purpose sufficient to render it void. The chancellor so found, and the defendant's assignments of error which challenge his decree are overruled.

Referring to complainant's assignment of error which relates to the denial of a recovery for $1,384.50, alleged to constitute a preference in favor of the bank, we concur in the conclusion of the chancellor that the bank is not liable. The bank could not reasonably believe or contemplate that such payments constituted a preference. Blucher Blair testifies that the bank had no knowledge of F. W. Blair's outside indebtedness, and there is nothing in the record to suggest that any of the bank officers had reason to believe that Blair owed debts beyond his liability to the bank when the checks, which make the item of $1,389.50, were delivered to, and received by the bank in the regular course of business as had been done throughout the period of their dealings, which it expected would continue. The payments were made before Blucher Blair informed the bank of his father's financial condition.

"There is nothing in the statute which deprives a bank, with which an insolvent is doing business, of the rights of any other creditor taking money without reasonable cause to believe that a preference will result from the payment.

The Bankruptcy Act contemplates that by remaining in business and at work an insolvent may become able to pay off his debts. It does not prevent him from continuing in trade, depositing money in bank, drawing checks, and paying debts as they mature, either to his own bank or any other creditor." 3 R. C. L., par. 103, page 277.

Affirmed. Each party will pay half the costs of appeal. Costs below as adjudged by the chancellor.