J. W. Ivy *v.* Binswanger & Co.

(*Jackson*, April Term, 1919.)

1. **PARTNERSHIP.** Agreement. Record insufficient to establish.

In an action on rent notes under a lease which had been assigned to a corporation organized by lessees, defended on the ground that the corporation had assumed liability and defendants were released under the lease terms, evidence *held* not to show that lessees had agreed upon a partnership. (*Post, pp.* 574-577.)

2. **CORPORATIONS.** Lease to corporate promoter. Provision releasing from liability. Evidence.

Where a lease to corporate promoters provided that they were not to be personally liable for rent accruing after the thirty-sixth installment was paid, provided the corporation was organized and became lessee, and $20,000 in cash was paid into its treasury, lessor's contention that such sum had not been paid in, *held* contrary to the evidence. (*Post, pp.* 577, 578.)

3. **CORPORATIONS.** Contracts between promoters and third persons. Payment for corporate stock. Furnishing machinery.

Where a contract by promoters with third persons required the payment of a certain amount of cash into the treasury of a corporation being organized, payment for stock by purchase of machinery *held* sufficient, the formality paying the money for the machinery and repaying it into the treasury being useless. (*Post, pp.* 578-582.)

Cases cited and approved: Kelly Bros. v. Fletcher, 94 Tenn., 6; Bristol Trust Co. v. Jonesboro Trust Co., 101 Tenn., 554; Morgan Bros. v. Coal & Iron Co., 134 Tenn., 244.

Cases cited and distinguished: Mills v. Faris, 59 Tenn., 457; Nunnelly v. Warner Iron Co., 94 Tenn., 282; Searight v. Payne, 74 Tenn., 285.

FROM SHELBY.

Error to the Circuit Court of 'Shelby County. Hon. H. W. Laughlin, Judge.

Fant & Fant, for plaintiff in error.

M. E. Lesser for defendant in error.

Mr. Justice McKinney delivered the opinion of the Court.

This suit was instituted by Binswanger & Co. against J. W. Ivy to recover on the last ten of a series of fifty-four notes executed to it by the said J. W. Ivy and one R. D. Harris on August 10, 1912; each of said notes being for $160, and due, respectively, on the 1st day of each month, beginning April 1, 1913.

Said notes were lease notes for the rent of the building which Binswanger & Co. was to erect and turn over to the said lessees on October 15, 1912.

Ivy defended on the ground that, under the terms of the lease, more than thirty-six of the notes having been paid, he was released and not bound for their payment.

There was a judgment below for the balance due on said notes, which was affirmed by the court of civil appeals. Harris was not sued.

It seems that Harris and Ivy desired to organize and operate a corporation in the city of Memphis for the purpose of manufacturing candy. Binswanger & Co.

owned a vacant lot in Memphis which adjoined its place
of business, and on August 10, 1912, it entered into a
written agreement with the said Harris and Ivy, by
which it contracted to construct a building on said lot
for the said Harris and Ivy, or for the corporation to
be organized by them. So much of the contract as per-
tains to the issues involved in this suit is as follows:

"This agreement made and entered into by and be-
tween Binswanger & Co., Inc., a corporation chartered
under the laws of the State of Virginia, whose charter
is regularly and duly filed for record in the office of the
Secretary of State for the State of Tennessee, and
which is lawfully authorized to do business in the State
of Tennessee, having an office at the city of Memphis,
Tenn., party of the first part, and R. D. Harris and J.
W. Ivy, both of the city of Memphis, county of Shelby,
and State of Tennessee, parties of the second part,
witnesseth:

"That the said party of the first part has this day
demised and leased, and by these presents does here-
by demise and lease, unto the said parties of the second
part, a certain three-story brick and concrete building
to be erected on a lot of land fronting thirty-six feet on
the south side of Union avenue, extending southwardly
between parallel lines to the right of way of the South-
ern Railway Company, and which said lot is located
between the right of way of the Southern Railway
Company on the west and Myrtle street on the east,
and lies immediately west of and adjoining the three-
story brick building No. 645-655 Union avenue, in Mem-
phis, Shelby county, Tenn., which said building is to
be erected according to plans and specifications submit-

ted by the party of the first part to the parties of the second part, and which have been accepted and approved and identified by the signatures of the parties hereto.

"To have and to hold the said premises for the term beginning on the 15th day of October, 1912, and ending on the 31st day of August, 1917, inclusive; the parties of the second part yielding and paying therefor a gross rental of $9,360, payable in monthly installments, whereof the first five installments, amounting to $800, have been paid in cash by the parties of the second part to the party of the first part, the receipt whereof is hereby acknowledged, and the remaining $8,560 is evidenced by fifty-four promissory notes, of even date herewith, one whereof is for the sum of $80, payable on the 15th day of March, 1913, and the remaining fifty-three are for the sum of $160 each, the first payable on the 1st day of April, 1913, and the remaining fifty-two successively on the 1st day of the next succeeding fifty-two months of said term; all of which said notes are executed and delivered by the parties of the second part, said rent reserved herein being payable in advance, at the office of the party of the first part.

"This demise and lease is upon the condition that the said premises herein demised and leased shall be used solely for the manufacture of, handling, and dealing in candy, soda, charged and mineral waters, cakes, crackers, dried fruits, syrups, and confections, and other goods similar thereto, and for no other purpose. But this clause shall not apply in case this lease shall be transferred to other parties with the consent of the first party as hereinafter contracted for.

"The said parties of the second part contemplate

the organization of a corporation to carry on in the herein demised premises the business hereinbefore authorized.

"The party of the first part does covenant and agree that if at any time the parties of the second part shall form, organize, and incorporate a corporation under the laws of the State of Tennessee, in compliance with the statutes of said State in that behalf enacted, a corporation with an authorized capital of not less than $50,000, whereof at least $20,000 shall be paid in cash into said company, said parties of the second part shall have the right to assign and transfer the within lease to said corporation, and the party of the first part will accept said corporation as its tenant in said premises upon the same terms, provisions, agreements, covenants, conditions, and limitations as herein set forth, and as if named herein as one of the lessees, without, however, in any wise releasing or discharging said parties of the second part from their liability on the first thirty-six installments of said rent.

"The said parties of the second part further covenant and agree that in the event said corporation is organized and is accepted under the terms hereof as the tenant of the party of the first part, that they will remain bound upon their said obligation notwithstanding there shall be any departure from the within lease by reason of any agreement between the party of the first part and said corporation.

"The party of the first part covenants and agrees that if said corporation shall be organized as aforesaid, and accepted as tenant in accord with the provisions hereof, that it will release the parties of the

second part from any individual liability on any and all installments of rent accruing after the thirty-sixth installment is paid.''

This building was completed and turned over to the lessees some time in November, 1912, and Mr. Ivy testifies that—

''Immediately upon opening our doors an application for a charter was made, and our business was always conducted as the Harris-Ivy Candy Company. For some reason the granting of the charter was delayed. We didn't wait until the charter arrived to begin business. We thought that we were entitled to do business in our corporation name as though we were authorized by the State. Every rent check after the $800 had been advanced was paid by the Harris-Ivy Candy Company.''

Upon being asked as to when they began doing business this witness says:

''Why some time in December we manufactured some goods to try out the machinery more than anything else. We had no salesmen, offered no goods for sale, and solicited no business until possibly right at Christmas, when we offered some goods that we had made at that time, but we had applied for the charter.''

The charter in fact became effective on February 1, 1913, and the charter name of the corporation was the ''Harris-Ivy Candy Company,'' the name by which the company was operated from the day it opened its doors until it ceased to do business in 1916.

It appears that shortly after the lease contract was executed the lessees began to make contracts for their

machinery, so as to have it ready for installation upon the completion of the building.

A good deal has been said as to a partnership, composed of Harris and Ivy, doing business under the firm style of the Harris-Ivy Candy Company, prior to the obtaining of the charter of incorporation. There is nothing in the record to sustain such a charge. In fact, no such partnership was contemplated or agreed upon, or in fact ever existed. It was intended from the beginning that this enterprise should be a corporation, and it was so treated by all of the parties, and they undertook to operate it as such from the beginning. It is true that they carried on the business for a month or two prior to the date that the charter was actually issued, and, no doubt, the individuals would have been liable as such for any obligations incurred during that period, but they would not have been liable as partners, for the reason that there was no partnership in existence.

In 30 Cyc. 349, the author says: "The definition of a partnership which seems to be most accurate and comprehensive is that of Chancellor Kent, as follows: 'A contract of two or more competent persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business, and to divide the profit and bear the loss in certain proportions.'"

Binswanger & Co. insist that they were never notified of the incorporation of the company and of the transfer of the lease by Harris and Ivy to the corporation. The proof shows conclusively that the lease was transferred to the corporation.

Mr. Binswanger, on his cross-examination was asked the following question:

"Q. You knew that Harris-Ivy Candy Company was incorporated under the laws of Tennessee on or about the 1st day of February, 1913, did you not?

"A. I had no definite knowledge. I presumed that they did."

On this question Mr. Ivy testifies as follows:

"Q. Do you know of your own knowledge of any notice, either verbal or written that was ever given by you or Mr. Harris, or the Harris-Ivy Candy Company, advising Binswanger & Co. that you had assigned the lease to the Harris-Ivy Candy Company?

"A. No more than Mr. Binswanger was notified that there was $25,000 of stock paid into the concern. That was not a business notice, but an informal discussion in which we were stating our condition to him—talking in the office. That we had $25,000 paid-up capital. That was after the incorporation of the company. We were in the building operating. Mr. Binswanger was making a call in our office, and we were discussing the affairs at that time."

This business of the candy company was conducted next door to Binswanger & Co., and it appears from the proof that Mr. Binswanger frequently came to the candy plant, inspected same, discussed its business affairs with its officers, and its rents were paid in every instance, excluding the advance payment of $800, by the checks of the corporation.

On this question the court of civil appeals in its opinion says:

"There is no direct evidence in this case that Binswanger & Co. were ever notified of the organization of this corporation, and Binswanger himself swears that he was not. The fact that he received the checks of the corporation, under ordinary conditions, would be conclusive proof of that question, but in this particular case it is made to appear that the checks issued subsequently to the incorporation were signed exactly as they were before its organization, so that that cannot be taken as constituting notice. In the absence of notice and in the absence of knowledge on his part, of course, payment in this way would not constitute, in the opinion of the court, payment by the corporation, and would not operate as an estoppel against Binswanger."

Mr. Binswanger does not deny any of the testimony of Mr. Ivy on this question. Taking this record as a whole, we think the evidence is ample to justify the court in holding that Binswanger & Co. had knowledge that this was a corporation and that the rent was paid with the checks of the corporation.

We find nothing, however, in the contract providing that any formal notice shall be given to Binswanger & Co. of the incorporation of the company. We do not think there is anything whatever in this contention.

The error committed by the court of civil appeals was in holding that checks had been issued prior to the incorporation signed "Harris-Ivy Candy Company." We find no such evidence in the record, and certainly no such checks were ever given to Binswanger & Co. The fact is that, five months of the rent having been paid in advance, none of said rent notes became due until April

1, 1913, which was two months after the company was incorporated

When the $800 was paid in August, 1912, Harris and Ivy each executed their individual check for $400, and, so far as this record shows, Binswanger & Co. never received a check signed "Harris-Ivy Candy Company" until after the incorporation of the Company.

It is next insisted that the $20,000 in cash provided for in the contract was never paid into the treasury of the corporation.

We do not think this contention is well made, so far as the rights of the parties to this suit are concerned. As the machinery for the company began to arrive, Mr. Ivy advanced the money out of his individual funds to pay for same. Including the $400 advanced on account of rent, he had advanced for the company, at the time the charter was issued, $10,300, and the company issued to him stock for this amount. As to this item the defendant in error does not make any special complaint, and none could have been successfully made. It would have been a useless formality for Ivy to have executed to the company his check for $10,300 in payment of his stock, and for the company at the same time to have executed to Ivy its check for a like amount on account of advances made by him for the company.

A man by the name of Partee also became a stockholder in the company, subscribing for fifty shares of its stock, for which he paid to the company $5,000 in cash.

Mr. Harris advanced $400 on account of rent, paid to the company $3,100 in cash, and furnished it ma-

chinery or advanced for it on account of machinery purchased for it, $6,500, making a total of $10,000, and stock was issued to him in that amount.

Excluding the $6,500 item, the amount of cash paid to the company by these stockholders amounted to $18,800 and with the $6,500 added the amount totalled $25,300, for which stock was issued to the respective parties in February, 1913. And, as thus organized, the corporation carried on its business until 1916, when the company became a bankrupt. So there can be no question as to the good faith of these transactions, and no such question is made.

Mr. Harris, it appears from the record, is a resident of Detroit, Mich., and did not testify in this case.

As to the item of $6,500 for machinery, it seems that the American Confectionery Company of Nashville had had a fire. It had a lot of machinery for making candy, most of which was new and had never been used. It was unable to adjust its loss with the insurance company, and so it sold this machinery to Mr. Harris. As to whether Harris bought this for himself or for the company the proof does not show. Neither does the proof show whether Mr. Harris made any profit out of the transaction, but the uncontroverted proof was that the machinery was well worth $6,500, and that this purchase was agreed to by the company. The company necessarily had to have machinery to carry on its business. If Mr. Harris had paid the $6,500 in cash to the company for his stock, and the company had immediately paid him back the $6,500 for the machinery, the provision of the contract in question would have been literally complied with. We do not

think such a formality had to be gone through with. We think the spirit of the contract was fully complied with.

Evidently the object which Binswanger & Co. had in having this provision incorporated in the contract was to guarantee the good faith of the transaction, and to guarantee the strength, stability, and effectiveness of the company. In other words, if these parties were willing to invest $20,000 of their funds in the venture and were willing, in addition, to insure the payment of the first thirty-six notes, Binswanger & Co. were willing to look to the corporation for the payment of the remaining eighteen notes.

The objections interposed by the defendant in error are entirely too technical Suppose, for example, that the parties, in order to comply with this provision of the contract, had actually paid into the treasury of the new corporation $20,000 in cash, and that thereupon the company had paid this $20,000 back to these same parties for a lot of old machinery that was not worth more than $5,000. While this would be a literal compliance with the letter of the contract, it would be absolutely violative of the spirit of the contract, and we do not think, under such a state of facts, that the parties could successfully resist payment of the remaining notes after the first thirty-six had been paid. And in this instance the present defendant in error would not be insisting, as it is now doing, upon a literal compliance with the contract.

"It is a well-settled rule in this State that the governing principle of construction is the intention of the parties, and that this intention may be ascertained by looking to the situation of the parties, the motive which

induced the agreement, and the objects and purposes designed to be effected by it; the sole object of the court being to do justice between the parties by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time it was made." *Mills* v. *Faris*, 12 Heisk., 457.

"In ascertaining the intention, the situation of the parties, the motives that led to the agreement, and the objects designed to be effected by it may all be looked to by the court." *Nunnelly* v. *Warner Iron Co.*, 94 Tenn., 282, 29 S. W., 124.

In *Searight* v. *Payne*, 6 Lea, 285, where the complainant, instead of paying for his subscription in cash, paid for it with other property, the court approved of this method of paying for his stock and said:

"To go through the mere form of paying in the money, and immediately paying it out for the property, would not in any way facilitate the business, or aid the after creditors of the firm, nor furnish them any additional security for their debts."

"It is quite as well settled that the subscriber may pay and satisfy his stock subscription either in money or in such property as the corporation may need, and agree to take, in good faith and at a fair valuation; and, if the property is taken at a fair valuation and in good faith, the payment is as effectual and as valid as though made in cash to the same amount" *Kelley Bros.* v. *Fletcher*, 94 Tenn., 6, 28 S. W., 1100; *Bristol Trust Co.* v. *Jonesboro Trust Co.*, 101 Tenn., 554, 48 S. W., 228; *Morgan Bros.* v. *Coal & Iron Co.*, 134 Tenn., 244, 183 S. W., 1019, Ann. Cas., 1917E, 42.

"Even where the charter, statute, or other governing instrument, by its terms, requires payment in money, yet unless the language is such as to import a prohibition of anything but money, the courts are generally agreed that payment may be made in any kind of property or services which the corporation may lawfully purchase in the prosecution of its business, provided it be done in good faith, and provided such property or services be conveyed or rendered at a fair valuation. The reason is that the law does not require the parties to go through the vain transaction which would be exhibited if the subscriber should pay for his shares in cash, and if the corporation should hand back the cash in purchasing from the subscriber such property as the corporation might wish to buy from him; or what would be the equivalent of such a transaction, that there should be a mere exchange of checks between the parties." 10 Cyc., 472.

"Under the old common-law rule, a strict performance is usually required as a condition precedent to recovery; but the modern rule is more liberal, and it may now be stated as a general rule that a substantial performance in all respects in good faith is sufficient to satisfy the law." Elliott on Contracts, Section 1878.

"As a general rule, a slight difference between the performance and the specification, or a very technical breach which causes no damages, and where the result is the same and fully as good as if there had been a literal compliance, cannot be taken advantage of as inconsistent with or failing to constitute substantial performance." Elliott on Contracts, Section 1879.

As to the authorities relied upon by the defendant in error, we do not deem it necessary to discuss them in detail, as we do not consider them in point or inconsistent with our holding herein.

We are of the opinion that the merits of this case are with the plaintiff in error. It results, therefore, that the judgment of the court of civil appeals and of the lower court will be reversed, the suit will be dismissed, and the defendant in error will be taxed with all the costs.