RUSSELL et al. v. TENNESSEE & KENTUCKY TOBACCO CO. et al.

NATIONAL BANK OF KENTUCKY et al. v. SAME.

Middle Section. July 29, 1933.

Petition for Certiorari denied by Supreme Court, December 9, 1933.

True & Dorsey, of Springfield, and Ed. T. Seay, of Nashville, for National Bank of Kentucky et al.

Charles Willett, of Springfield, for appellee, S. R. Russell.

R. L. Peck, of Springfield, for appellees, R. F. and E. B. Long.

DeWITT, J. This appeal involves the right of the creditors of the Tennessee & Kentucky Tobacco Company, a corporation, to hold S. R. Russell, R. F. Long, R. F. Long, trustee for E. B. Long, and E. B. Long, liable as stockholders, directors, and officers thereof for (1) unpaid capital stock; (2) incurring indebtedness in excess of the paid-in capital; and (3) on the ground that the corporation was a sham and a fraud and was so operated; and there is also involved the validity of the claim of Clem W. Russell against said corporation for borrowed money.

The original bills in these causes were filed as general creditors' bills to wind up the affairs of the Tennessee & Kentucky Tobacco Company as an insolvent corporation. The issues here presented arose among the complainants in these bills respectively.

On August 13, 1925, the first of these bills was filed by S. R. Russell and R. F. Long, trustee for E. B. Long, based on a note of said corporation for $1,063,33, dated July 31, 1924, due eight months after date, payable to the order of Miss Mary Dunn, and which said complainants alleged had been transferred to them by her for value. It was alleged that said corporation was insolvent, and certain of its debts were set forth in the bill, as well as its principal assets.

The second bill was filed on September 5, 1925, by the National Bank of Kentucky and the receiver of the People's Bank of Springfield. And in this bill the validity of the said claim of Russell and Long, trustee, was attacked, and it was sought to enjoin the prosecution of the former suit. S. R. Russell, E. B. Long, R. F. Long, and R. F. Long, as trustee for E. B. Long, as defendants, were sought to be charged with liability for capital stock of said corporation held by them and unpaid for, and for incurring indebtedness in excess of the paid-in capital, and for operating said corporation as a sham and a fraud. The claim of defendant Clem W. Russell upon a note for $1,500, purported to be secured by a chattel mortgage of said corporation, was attacked.

In both bills various creditors of said corporation were made defendants; and it was prayed in each bill that it be sustained as a

general creditors' bill, that all other creditors be enjoined from prosecuting any suits against said corporation, but be required to prosecute their claims in the cause; that a receiver be appointed to take possession of all the property of said corporation, convert it into money; that reference be had to the master to take and state an account of assets and liabilities; and for general relief.

On November 16, 1925, the chancellor on motion sustained the bill of Russell and Long as a general creditors' bill, refused to sustain as a general creditors' bill the bill of National Bank of Kentucky and the receiver of the People's Bank of Springfield; but he ordered the latter bill to stand in the nature of a cross-bill to the bill of Russell and Long as "to the matters and things therein contained alleged against the several defendants named therein, but not related to a general creditors' bill." He ordered that publication be made for creditors requiring them to set up and prosecute their claims in the suit brought by Russell and Long, appointed the clerk and master as receiver of the corporation and directed him in his duties; and retained in court the bill of Russell and Long as an original bill, and the other bill as a cross-bill, as he had defined in the decree.

The corporation having failed to answer, a decree pro confesso was in time duly entered against it; but answers were filed by Russell, R. F. Long, trustee, R. F. Long, and E. B. Long as cross-defendants, denying all of the charges made against them; averring that they had paid for their stock, had not incurred indebtedness in excess of the paid-in capital; and had not operated the corporation as a sham and a fraud. An answer was also filed by Clem W. Russell averring that he did make a loan of $1,500 to the corporation on August 9, 1924, and that the note and mortgage held by him were bona fide. Upon a voluminous record, upon the final hearing the complainants in the second bill again excepted to the action of the court in sustaining the first bill as a general creditors' bill, and in not sustaining the second bill as a general creditors' bill, and in not enjoining the further prosecution of the first suit; but the chancellor overruled said exceptions and he also dismissed the second bill as a cross-bill. The complainants in said bill prayed and perfected an appeal to this court.

More specifically stated it is sought to hold S. R. Russell, R. F. Long, trustee, R. F. Long individually, and E. B. Long, liable for $9,000 each for unpaid subscriptions to the capital stock, and as officers and directors for contracting debts in excess of the capital stock, for unauthorized and illegal purchase of a farm unauthorized and improper lease of a warehouse, and for making fraudulent financial statements as to the affairs of the corporation in order to obtain credits. Upon the issues thus created the chancellor found and decreed as follows:

"As to the capital stock, the Chancellor finds that no specific pay-

ments were made to the corporation but the defendant stockholders placed their credit behind the corporation and procured a loan with which the property, which constituted the capital of the corporation was purchased. This was payment within the requirement of the law.

"No single debt contracted was in excess of the amount of the capital stock.

"The corporation lost nothing by the purchase of the farm complained of.

"The lease of the warehouse was made August 15, 1924, after the Peoples Bank closed. It was authorized by the Board of Directors at $3,000 per year which was full value, and has been paid and distributed to creditors by decree of this Court.

"The Court finds that all the debts sued on were contracted by the defendant corporation; that its corporate existence was complete; that all the debts sued on were contracted by the defendant corporation with the said Peoples ·Bank and .charged to defendant corporation; that the President of said Bank, H. T. Stratton was Vice-President of defendant corporation, and that R. F. Long, cashier of said Peoples Bank, was defendant's Treasurer.

"That the credit given by said Peoples Bank to defendant corporation was not induced by deceit or fraudulent misrepresentation.

"Neither the Peoples Bank nor the cross-complainant, National Bank of Kentucky extended to or gave defendant corporation any credit on the faith of the statements filed as exhibit No. 1 and exhibit No. 2 to the deposition of the witness, H. T. Stratton. The defendant had no dealings with the cross-complainant, National Bank of Kentucky.

"The Peoples Bank and its President, H. T. Stratton and cashier, R. F. Long, were at all times fully aware of the financial condition of the defendant, Tennessee & Kentucky Tobacco Company, and said Bank was not misled when credit was given defendant corporation.

"When the State granted defendant's charter, and stock was issued and a Board of Directors elected, the Tennessee & Kentucky Tobacco Company became a complete corporation and legal entity and was so dealt with by its creditors. The stockholders and directors were not liable for the corporate debts. To avoid such liability was the reason for the organization of the corporation. The defendant corporation was in business for more than six years doing a large volume of business each year, and doing almost all its banking business with the said Peoples ·Bank, and all charges were made in the name of and against the defendant, Tennessee and Kentucky Tobacco Company and so charged on said bank books."

The Tennessee & Kentucky Tobacco Company was incorporated in March, 1918, as the Bohanan Tobacco Warehouse Company, with R. T. Bohanan, E. ·B. Long, J. A. Long, Harold Bell, and A. G. Woodard as

the incorporators; with an authorized capital stock of $36,000. The original subscribers to the capital stock were R. T. Bohanan, H. T. Stratton, R. F. Long, and R. F. Long, trustee for E. B. Long. No money was ever paid to the corporation directly for these shares of stock. Each of these four stockholders subscribed for stock amounting to $9,000 par value, except Stratton, whose stock was given to him. In September, 1918, by an amendment to the charter, the name of the corporation was changed to Tennessee & Kentucky Tobacco Company. The purposes of incorporation were stated in the charter as, "storing, buying, selling and dealing in tobacco either on loose leaf floors, in hogsheads, on commission or otherwise, and doing any and all things necessary and proper for the purpose of carrying out the objects and purposes of said corporation; the said corporation to be located at Springfield, Robertson County, Tennessee."

At the time of its organization the corporation had no property necessary to conduct its business, no money, and no credit; but it purchased a warehouse property for the sum of $22,000, of which $5,500 was furnished in cash by the stockholders, and for the balance the corporation executed its three notes for $5,500 each, secured by lien on the property and by personal indorsements of the stockholders. These notes were discounted by the Robertson County Bank & Trust Company, and were afterwards paid. They were paid either with earnings of the corporation or with moneys borrowed from the People's Bank upon the indorsements of the stockholders. After the warehouse property was purchased, the company also purchased such equipment as was necessary.

For about three months after its incorporation, the company engaged in business without any success. The evidence shows that by that time the corporation was indebted to the extent of $38,000 to $40,000. How much of this was secured by personal indorsements by the stockholders, it is difficult to determine from the evidence; in fact, much of the testimony consists of rather vague general statements, and there are some self-conflicts in the testimony of two or three of the witnesses. In part, this is due to the loss of books and other records, partly by fire and partly by disappearances for which the appellees do not seem to have been responsible.

About the end of the first three months, R. T. Bohanan retired from the corporation as manager, and he was succeeded by S. R. Russell, who also acquired his stock. Russell testified that Bohanan's stock certificate was transferred to him, but he was unable to find it. He also testified that when he acquired it he thought that it represented paid-up stock.

E. B. Long, who was president of the corporation, testified that he knew of no reason why Russell should not have known that the stock had not been paid for. Russell testified that he merely assumed Bohanan's status as one of the indorsers to the People's

Bank; that he became liable for one-fourth of such indebtedness. Bohanan could not remember that he had ever turned over any stock certificate to Russell. His testimony was taken more than ten years after the transaction. He could not remember whether or not he had ever indorsed any paper for the corporation; but he said that the stockholders must have assumed personal responsibility, or the corporation could not have borrowed money.

R. F. Long, who was cashier of the People's Bank, testified that the stockholders of whom he was one, did assume personal liability for the debts of the corporation by indorsing its paper and thus giving it credit.

E. B. Long testified that for the stock issued to him, he indorsed or guaranteed the payment of the obligations of the corporation; and that Bohanan assumed obligations for it. The conclusion is inescapable that these parties did lend their credit to the corporation to the amount of its capital stock, for otherwise it could not have acquired its properties and engaged in business. It does not appear that any of the stockholders ever had to pay anything by reason of their indorsements. The concern did a successful business, earning substantial profits, at least until its warehouse was destroyed by fire in 1920. Russell estimated the value of the company's plant at that time at $80,000. There is no clear evidence as to how much the company then owed; but all of the appellees testified that it had made large profits, taken care of its obligations, and enlarged its plant and equipment; and that, although they considered the profits as theirs, they would not draw them out as dividends. They insist that these profits, which they could have drawn as dividends, were equal to the par value of their capital stock; that they were allowed to be retained by the corporation to augment its assets; and that this should be treated as a full, though indirect, payment for their capital stock. In the testimony of R. F. Long, this is stated as follows:

"Q. How did the Tennessee and Kentucky Tobacco Company operate after succeeding the Bohanan Tobacco Warehouse Company? A. Well, they operated with Mr. Russell as secretary and manager, and they obtained credit by the indorsements of the personal credits of the stockholders, and they did a good business and let the dividends—they didn't draw any dividends and let all the earnings stay in the Company, and they operated for a period of time. It was estimated that the earnings and property were worth much more than the capital stock."

It appears that the destruction of the property by fire in 1920 was probably the beginning of the downfall. The fire was alleged to have been due to the negligence of employees of the Standard Oil Company. A settlement of the claim for damages was made for forty per cent of the estimated loss. The tobacco company then built

a larger and more expensive plant by using what money it had and borrowing a large sum, giving a first mortgage on its plant as security. This plant, which the appellees estimated to be worth at least $100,000, was sold under the deed of trust during the pendency of this cause and at forced sale brought $60,300. The company suffered, in addition, heavy losses from loans or advancements to farmers. It continued to do business until the summer of 1924, when the People's Bank failed. The company was then indebted to it and other creditors in large sums and was insolvent. It could get no more money with which to carry on its business.

(1) The Tennessee & Kentucky Tobacco Company was duly incorporated under the laws of the state of Tennessee, and it was duly organized with directors and officers and engaged in the business for which it was chartered and organized. It was not a sham organization.

(2) The charter of said corporation contained the following provisions taken from the general laws of the state:

"The amount of unpaid stock due from the subscriber to the corporation shall be a fund for the payment of any debts due from the corporation, nor shall the transfer of stock by any subscriber relieve him from payment, unless his transferee has paid up all or any of the balance due on the said original subscription." By virtue of the provisions of sections 2335 and 2351, Shannon's Ann. Code, nothing but cash could be taken in payment of any part of the capital stock, or land at a fair cash valuation, or the assignment of a patent to the amount of the value of the patent as agreed on by the subscriber and the corporation.

However, the rule is well settled that a corporation may treat as payment for stock any property which it is authorized to own and which is necessary to the operation of its business, provided that it is taken in good faith and at a fair valuation. Kelley v. Fletcher, 94 Tenn., 1, 28 S. W., 1099; Shields v. Clifton Hill Land Co., 94 Tenn., 123, 28 S. W., 668, 26 L. R. A., 509, 45 Am. St. Rep., 700; Searight v. Payne, 6 Lea, 284; Bristol, etc., Trust Co. v. Jonesboro, etc., Trust Co., 101 Tenn., 545, 48 S. W., 228; Morgan Brothers v. Coal & Iron Co., 134 Tenn., 228, 183 S. W., 1019, Ann. Cas., 1917E, 42; Ivy v. Binswanger & Co., 141 Tenn., 568, 214 S. W., 74, 78. In the last mentioned case the following from the text of 10 Cyc., 472, was quoted with approval:

"The reason is that the law does not require the parties to go through the vain transaction which would be exhibited if the subscriber should pay for his shares in cash, and if the corporation should hand back the cash in purchasing from the subscriber such property as the corporation might wish to buy from him; or what would be the equivalent of such a transaction, that there should be a mere exchange of checks between the parties."

Also the following from Elliott on Contracts, section 1878:

"Under the old common-law rule, a strict performance is usually required as a condition precedent to recovery; but the modern rule is more liberal, and it may now be stated as a general rule that a substantial performance in all respects in good faith is sufficient to satisfy the law."

In the aforesaid cases tangible properties were received by the corporations involved, different in character from the property which the appellees in the instant cause insist was used in satisfaction of the subscriptions. We have stated the aforesaid rule and cited the supporting cases as fundamentally showing that it is not necessary to pay directly to the corporation cash, or to convey to it land, or to assign to it patent rights, but all that is required is a substantial performance within the limits aforesaid. And the rule is, further, that when such property has been transferred, even machinery, as in Ivy v. Binswanger, supra, the presumption is that the value of it was adequate for satisfaction of the subscription at par value, and the burden is on the party attacking it to show that the value was not adequate. Kelley v. Fletcher, supra; Morgan Bros. v. Coal & Iron Co., supra.

In the instant case it does appear that these appellees loaned their credit to the corporation, thereby enabling it to accumulate property in value to the extent of at least twice the value of the capital stock. It does not appear that this corporation was materially indebted at the time when it enjoyed this status, just before the fire occurred. We are compelled to hold that the mere lending of credit, the indorsing of notes for the corporation, when the indorsers were not compelled to pay anything by reason of the indorsements, was not consideration for the issuance of shares of stock to the indorsers. Bernard v. Carr, 167 N. C., 481, 83 S. E., 816. In such case the stockholder pays nothing, he has merely loaned something and the credit which was loaned was abated when the corporation paid the debt. His motive for merely lending his credit was to aid the corporation in making profits and accumulating a surplus out of which dividends might be paid on stock for which he has paid nothing; and the stock itself would then be valuable to him. Our laws contemplated that the corporation itself should receive for its capital stock land, money, or patent rights; and it is only when some other property necessary to its business was actually transferred to it as the equivalent in value of cash that it should be received in payment. Such property then belonged to the corporation just as it would had money been paid into its treasury for the stock and then paid out for the property. We have no statute or reported decision in Tennessee to the effect that mere lending of credit could be made in payment of a subscription to capital stock. It does fairly appear that this corporation, by the time of the loss of its property by fire, had accumulated profits from its

business equivalent to the total of its capital stock at par value; that these profits could have been lawfully paid to the stockholders in dividends; that the stockholders agreed not to declare or draw dividends. The purpose of this agreement was that the profits might be used in paying for the property and extending the business of the corporation. There is no evidence of any agreement to devote the profits to the payment of subscriptions to stock, or to treat the stock as paid-up in consideration of the surrender of the profits to the corporation. The case is therefore quite different from the cases (Kenton Furnace Railroad, etc., Co. v. McAlpin [C. C.], 5 Fed., 737; Kryger v. Andrews, 65 Mich., 405, 35 N. W., 245; Lantz v. Moeller, 76 Wash., 429, 136 Pac., 687, 50 L. R. A. [N. S.], 68), supporting the rules stated in 14 C. J., 442, as follows:

"A corporation free from indebtedness, if acting in good faith, has the power as between itself and its stockholders, all of the stockholders entering therein, to agree, in consideration of the surrender by the stockholders to it of accumulated profits, and of the increased value of its property, to treat stock on which only fifty per cent has been paid, as fully paid-up stock, and the corporation cannot afterward disturb such an arrangment, either in its own behalf or in behalf of subsequent creditors with notice."

The case before us does not fall within these rules, for it does not appear that there was no indebtedness or that there was any agreement to surrender the right to the profits for payment of subscriptions to the stock. Prior to the enactment of chapter 90 of the Public Acts of 1929, the law did not allow a stock dividend to be issued against a surplus equal in value at a fair valuation. United Hosiery Mills Corporation v. Stevens, Secretary of State, 146 Tenn., 541, 243 S. W., 656. A corporation could not, by amendment to its charter, increase its capital stock, pay for it in surplus and undivided profits, and then distribute it to its stockholders, because the Legislature had not granted to it the right or power thus to pay for its stock. While the instant case does not involve a stock dividend, it does at least involve the treatment of profits as having been devoted by the corporation to payment for its stock which had been subscribed for by stockholders. The fundamental question is the same. As to this phase of it the law has not been changed.

To allow a corporation thus to operate without receiving a dollar for its stock; even to earn profits and accumulate a surplus; finally to become insolvent, owing large sums for borrowed money; and then to absolve its stockholders from liability for the capital stock subscribed and held by them, would be to sanction unsafe methods, ignore the law of liability of subscribers to stock, and grossly violate the rights of creditors. Our laws and our public policy did not permit the doing of such things. It appears that R. F. Long and R. F. Long, trustee for E. B. Long, subscribed each for $9,000 worth of the

stock at par value. The rule is that a trustee of stock who is recorded on the corporate books as a stockholder is, at common law, liable on such stock as though he were the absolute owner of the same, even though he is recorded as a trustee of the stock. Cook on Corporations (6 Ed.), section 245, and cases cited.

In behalf of S. R. Russell it is insisted that he is a bona fide purchaser and owner of his stock for value and without notice or knowledge that it had not been paid for by his vendor, Bohanan. If this is true, he cannot be held liable for the unpaid subscription. West-Nashville Planing-Mill Co. v. Bank, 86 Tenn., 252, 6 S. W., 340, 6 Am. St. Rep., 835; Albitztigui v. Mining Co., 92 Tenn., 598, 22 S. W., 739; Heymann v. Bank, 151 Tenn., 21, 25, 266 S. W., 1043. In 2 Cook on Corporations (6 Ed.), section 418, the rule is stated that the transferee who buys stock supposing it to be fully paid is not liable for uncalled and unpaid parts of the subscription, even though the certificate is silent as to whether the par value of the stock has been paid in or not.

The consideration for Russell's purchase of the stock was his taking the place of his vendor as an indorser for the corporation. He testified that Bohanan transferred his stock certificate to him; that it recited on its face that it was fully paid up; that he understood that this was true; that the books had been kept by Bohanan; and that when he took them they showed that the stock had been paid up. He said that he did not know that there was anything wrong with the books. There is no direct evidence to the contrary; but the contention made is that as Russell became secretary and manager he must be charged with knowledge of what he would have discovered had he made a diligent investigation. But the question must be tested as of the time of the negotiations and purchase, not by what Russell may have afterward learned, or ought to have learned. 14 C. J., 785, and cases cited. On page 784 of 14 C. J., the rules, supported by many decisions, are stated as follows:·

"Where the certificate is regular on its face, imports ownership in its holders, and contains no intimation of any equities impairing such ownership or full title, whether in the corporation or in third persons, an intending purchaser is not bound to suspect fraud or infirmity of title, but may rely upon the disclosures of the certificate, and is not bound to examine the books of the corporation to ascertain the validity. of the transfer, and even though he examines the books, he is not chargeable with notice of facts which they do not disclose."

In view of the absence of evidence tending substantially to contradict the testimony of Russell, we are unable to find that he was not a bona fide purchaser and owner of the stock; and it was not error to decree that he is not liable for the price of the stock acquired by him from Bohanan.

(3) The chancellor was not in error in holding that the appellees

were not liable as stockholders for any loss incurred in the purchase and operation of a farm of forty-four acres. It is true that the charter embodied the provision of the general law that the corporation should not be deemed to possess any powers except those expressly given, including powers to buy and sell agricultural products, deal in merchandise, or engage in any business outside the purpose of the charter. Whether or not the prohibition against buying and selling agricultural products and dealing in merchandise applied in the charter of such a corporation, in view of the specific purposes set forth in the charter, we need not decide; for even if the purchase and operation of the farm, which appeared to have been somewhat related to the business of the corporation, was ultra vires, the corporation incurred no loss therefrom. It appears that the farm cost $5,500; that crops were grown thereon and sold in the sum of about $5,000; and that the farm brought at a forced sale the sum of $3,360; thus the appellants are in no position to complain of these transactions. No recovery could be had when no loss was incurred.

(4) The chancellor was not in error in denying to the appellants a recovery for profits earned and received by S. R. Russell as lessee of the warehouse and manufacturing plant of the corporation. When the corporation failed and ceased to do business, and before any receiver was appointed, the plant was idle and the corporation could not operate or otherwise use it, except by leasing it out. It appears that it was leased by Russell for an annual rental of $3,000, which was the maximum rental that could have been obtained. This money was duly paid over as rent and neither the corporation nor the receiver had any expense in the operation of the plant under the lease.

(5) The chancellor was not in error in sustaining a claim evidenced by a promissory note of the corporation for $1,500 for borrowed money, payable to the order of Clem W. Russell and secured by a chattel mortgage. It appears clearly that Clem W. Russell loaned this sum to the corporation just after the People's Bank failed in order to enable the corporation to take up checks which it had issued in favor of farmers who were its customers, the checks being on said bank. The charge that this note and mortgage were fraudulent, being a colorable scheme on the part of S. R. Russell to cover up assets, is not sustained in the evidence. It is clear that Clem W. Russell did loan the money; that it was received by the corporation and used as aforesaid; and that the note and mortgage were not given for previous indebtedness, but that the consideration therefor passed in the form of money at the time of the execution of these instruments.

(6) The insistence that it was error to sustain the general creditors' bill of S. R. Russell and R. F. Long, is not well made and must be overruled. The bill on its face was sufficient, although brief, in its allegations and in its prayers as a general creditors' bill. When this

bill was filed, the National Bank of Kentucky had obtained a judgment against the Tennessee & Kentucky Tobacco Company, had registered it in the register's office, and was seeking thus to fasten a lien upon the property of the company, which lien, if undisturbed, would give to it a preference over other creditors of an insolvent corporation. Another creditor had also sought to impound property of the company to satisfy individual debts in full, and evidently it was to prevent this exclusive seizure of the company's property that the Russell and Long general creditors' bill was filed. It is true that in the second bill which was filed by the National Bank of Kentucky and the receiver of the People's Bank, the allegations were more elaborately given than in the former bill, but the record shows that the original cause has gone through all the necessary proceedings for the winding up of this corporation and the unsecured creditors have been paid a dividend of twenty cents on the dollar. It is too late now to consider the insistence that the second bill instead of the first should have been sustained as a general creditors' bill. If Russell and Long were not bona fide creditors of the corporation by reason of their owing to it the amounts of their subscriptions to its capital stock, nevertheless assuming that their claim is valid, it could not be set off against the claim of the receiver of the corporation for unpaid stock. The rule is that debts which a stockholder has against an insolvent corporation cannot be set off against a debt which he owes for unpaid stock, in a suit against him by a receiver of the corporation who represents all the creditors, and who in accordance with his duty is marshaling the assets in order to close up the affairs of the corporation and make a pro rata distribution. 7 R. C. L., 411. See, also, note, Ann. Cas., 1913E, 1027.

In addition it appeared that the said Russell and Long were bona fide owners and holders of a note of the corporation which it had executed validly to Miss Dunn, on which there was due a sum of $1,063.33—they having purchased the said note from Miss Dunn under circumstances under which they are to be commended. Miss Dunn had intrusted money to Long for investment according to his own judgment, he loaned it to the corporation; and when it appeared likely that the corporation would not be able to pay the debt, Russell and Long paid over the amount of it to Miss Dunn and took from her a transfer of the note and the security therefor.

(7) The claim that the appellees, as directors of the corporation, should be held liable for excess of the debts over the capital stock paid in, will now be considered.

Shannon's Ann. Code, section 2350, provides:

"If the indebtedness of said company shall at any time exceed the capital stock paid in, the directors assenting thereto shall be individually liable to the creditors for said excess."

This statute is in derogation of the common law, and must be

strictly construed against such liability. Allison v. Coal Creek & N. R. Co., 87 Tenn., 62, 9 S. W., 226; Tradesman Publishing Co. v. Car Wheel Co., 95 Tenn., 634, 32 S. W., 1097, 1104, 31 L. R. A., 593, 49 Am. St. Rep., 943.

Such liability of a director depends upon four conditions: First, assent by him to the creation of the debt upon which he is sued; second, that the debt has not been paid; third, that the corporation is insolvent; fourth, that the particular debt is in excess of the capital stock. Tradesman Publishing Co. v. Car Wheel Co., supra. In that case it was also held that the assent contemplated by the statute must be given by the directors, not as individuals, nor even as stockholders, but in their capacity as directors, each director acting concurrently with a majority of the official board. The court further said:

"We do not hold that the only evidence of this official assent must be found in the minutes of the board, but we do hold there must have been an official meeting when assent was given, whether it appears on the minutes or otherwise. In other words, we hold the official minutes do not constitute the only evidence of official assent, provided it is made otherwise to appear that at a meeting of the official body the directors sought to be charged assented to the creation of the particular debt."

Tested by these rules, we are unable to find that debts in excess of the capital stock paid in were officially assented to. The record does not show, by minutes or otherwise, that the debts sued on were assented to by any of the directors in meetings of the official body. These debts, exclusive of the mortgage debts amounted to about $38,000 to $40,000. The facts do not bring the case within the operation of the aforesaid section 2350.

(8) It is insisted that the chancellor should have compelled S. Russell to account for the sale of tobacco placed with him for sale by the receiver, amounting to $1.318,77. It is said that this proposition is so evident that it does not need argument or citation. Even if this were correct, the rules of this court require at least citation to the record to sustain it. The record has been very carefully read in our consideration of this case. The tobacco in question was raised on the forty-four-acre farm in the year 1924. It was sold by the receiver of the farm through the agency of Russell on the loose leaf floor and brought $1,318.77. Russell testified that he did not turn over any money to the receiver because he had "carried" the tenan's and paid the expenses on the farm, and there was due him $1,485.88, so that he had a loss. He testified that "the tobacco returns lacked $167.11 paying out:" and that he had taken care of the farm during that year. He made a report to the receiver. Upon this evidence which is not contradicted by any other evidence, the claim insisted upon is not sustainable.

(9) The remaining proposition, presented by the thirteenth assignment of error, is as follows:

"The Chancellor ought to have held the said S. R. Russell for the payment of the indebtedness of the corporation, because his conduct both before and since the commencement of this litigation has been so unconscientious and fraudulent toward creditors as to estop him from denying liability."

This insistence is based largely on matters which have hereinbefore been recited and disposed of. It is not shown that Russell suppressed the records of the corporation; nor that he failed to account to the receiver of the corporation for rent of the plant nor to the receiver of the farm for proceeds of its crop. Although the business operated at a profit, except for the first year, the increase of the indebtedness is shown to be due to the destruction of the plant by fire, the building of a much more expensive plant, and probably in the end to the depression in the tobacco market.

It does appear that S. R. Russell, as secretary of the corporation in January and July, 1924, submitted to the People's Bank of Springfield, of which his codirectors and stockholders, H. T. Stratton and R. F. Long, were president and cashier, respectively, certain papers purporting to be statements of the financial condition of the corporation. It appears that these statements were prepared by both Stratton and Russell, for the purpose of obtaining or maintaining a line of credit with said bank. There is much evidence tending to show that the valuations placed upon the company's property were not unreasonable and that they were not made with intent to deceive. However, it is clear that Stratton well knew, independently of this statement, of the true financial condition—so that, if there was any fraud, it did not work to the detriment of the bank. The knowledge of Stratton must be imputed to the bank. Smith v. Bank, 132 Tenn., 147, 177 S. W., 72; People's Bank & Trust Co. v. Potter, 156 Tenn., 649, 4 S. W. (2d), 341; Pearson v. Southall Bros., 12 Tenn. App. 182. The other banks to which certain notes of the corporation were pledged by the People's Bank, as part security for loans, are not shown to have taken these notes in pledge upon faith of the aforesaid statements. The statements were furnished only to the People's Bank. The chancellor was not in error in overruling the contention made in the thirteenth assignment of error.

It results that the decree of the chancery court will be affirmed, with the exception of a modification to the extent that a recovery will be awarded against R. F. Long for $9,000, and R. F. Long, trustee, for $9,000, with interest on each amount from September 5, 1925, in favor of W. D. Sugg, receiver of the Tennessee & Kentucky Tobacco Company. The cause will be remanded to the chancery court of Robertson county for further proceedings not inconsistent with this opinion.

The costs of the appeal will be paid, one-half by appellants or the sureties on their appeal bond, and the other one-half by R. F. Long and R. F. Long, trustee.

Faw, P. J., and Crownover, J., concur.